RING CONSTRUCTION CORPORATION, A MARYLAND CORPORATION, PETITIONER, *v.* SECRETARY OF WAR OF THE UNITED STATES, RESPONDENT.

Docket No. 12–R. Promulgated May 15, 1947.

*Josiah E. Brill, Esq.*, for the petitioner.
*Robert H. Winn, Esq.*, for the respondent.

1072

OPINION.

DISNEY, *Judge*: We should first consider the question of constitutionality of the Renegotiation Act, as propounded by the petitioner. It is, of course, to be presumed constitutional, and the burden is on the petitioner to demonstrate otherwise. Summarized, the reasons advanced for unconstitutionality are (a) that the Fifth Amendment to the Constitution of the United States, providing against taking of property without due process of law, protects the petitioner against impairments of its rights under a contract executed prior to passage of the Renegotiation Act, and that "recovery of excessive profits necessarily involves the impairment of the contract"; (b) that the statutory provisions giving the Tax Court of the United States "exclusive jurisdiction" to determine, finally and without review, the amount of any excessive profits violate the due process clause; (c) that no war or emergency conditions existed justifying any constitutional exercise of war powers in this matter, any need for speeding up the war effort having no application to contracts already let and any need to minimize profiteering, even assuming it to have any substantial application to contracts already let, having none to preexisting building construction or other contracts resulting from competitive bidding in accordance with statutory requirements, as to which there was no need for retroactivity sufficient to sustain the act, even if such contracts could otherwise be lawfully impaired; (d) Congress did not intend the Renegotiation Act to be applied retroactively; (e) the legislative history shows the act to be no revenue measure, and, even if a taxing act, it would still raise constitutional questions; and that, the contract providing that any increase in Federal taxes (other than income and undistributed profits) would be added to contract price, it would seem to follow that to construe the act retroactively applied as a Federal tax would violate the due process clause.

It should be noted at once that the petitioner concedes constitutionality of the act prospectively applied (eliminating from our consideration in this respect contract No. 1542) ; also (in line with *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289) that it is admitted that the war powers are broad enough to regulate war profiteering, "but that does not touch the question of the validity of the statute retroactively impairing the obligation of a private contract between

the government of the United States and a citizen." Again, the petitioner's brief states: "Our position is that retroactively applied the statute is invalid against parties contracting with the government * * *." Since the petitioner impliedly, at least, considers that under such cases as *Yakus* v. *United States*, 321 U. S. 414, involving the Emergency Price Control Act, and *Bowles* v. *Willingham*, 321 U. S. 503, involving that act as to regulation of rents during the war emergency, contracts between citizens can constitutionally be impaired, and since we think it plain from those cases and others along the same line, together with *Norman* v. *B. & O. R. Co.*, 294 U. S. 240, permitting impairment of the "gold clause" that the Congressional war powers permit constitutional impairment of contract between citizens, it becomes clear that the only real issue here presented is whether Congress may, under the war powers clause of the constitution, legislate retroactively on contracts between the *Government* and a citizen, notwithstanding the provisions of the Fifth Amendment giving right to due process in the taking of property. The respondent does not argue that a contractual right is not a property right. The petitioner urges (as against the gold clause cases) that in *Perry* v. *United States*, 249 U. S. 330, the sanctity of the gold clause was sustained as between government and citizen. The case, however, involved no application of the war powers of Congress, and offers no assistance here.

In *Stein Brothers Manufacturing Co.*, 7 T. C. 863, we held that the Renegotiation Act is not unconstitutional for any of the reasons there advanced. We think that in general the same reasons are advanced here. The petitioner urges that our conclusion was wrong, and asks reconsideration of the question and that this case be differentiated on the facts. We have, we believe, given the question most careful and thorough reconsideration, as called for by the thorough and thoughtful briefing it has been given by both parties. We are nevertheless not convinced either of error in the *Stein* opinion or that unconstitutionality has been demonstrated in this. No particular differentiation in pertinent fact of the *Stein* case is pointed out by the petitioner. The facts on the constitutional question are largely the same as in the *Stein* case, since the evidence in that case on the point was by agreement incorporated into this, together with cross-examination of the same witnesses. The petitioner stresses strongly other evidence which it is urged shows that at the time of the execution of the principal contract here there was extensive competitive bidding in the building construction industry and letting of contract here upon competitive bidding (one other bid being submitted on area C, though no other was submitted on area E). Since, however, the *Stein* case states: "All of the contracts here in question were obtained

after competitive bids were submitted," and since all of the contracts therein except one were executed and approved prior to April 28, 1942, we are unable to discern any differentiation in essential fact in this respect between this and the *Stein* case. Moreover, the presence of competitive bidding in that case and our conclusion of constitutionality cover the argument of petitioner here that extensive competitive bidding in the building industry rendered unnecessary exercise of any war powers. Whether or not competitive bidding was prevalent in the industry involved in the *Stein* case, it was present in that case, and we declined to hold the act unconstitutional. Since only one other bid was offered here (as to the contracts prior to April 28, 1942), there could not have been less competitive bidding in the *Stein* case.

The petitioner here, however, says that the opinion of the Circuit Court in *Spaulding* v. *Douglas Aircraft Co.*, 154 Fed. (2d) 419, cited in the *Stein* case and by the respondent here, was dictum so far as retrospective application of the Renegotiation Act is concerned, the *Spaulding* opinion pointing out that there was no allegation of execution of contracts prior to enactment of the act; and, of course, the force of the argument must be realized. Nevertheless, the resume of the many cases involving constitutional exercise of war powers by Congress and the reasoning of that court on the general subject of war powers were considered sound by us, and are now so considered, as applied to contracts executed prior to April 28, 1942, in the *Stein* case and here. Considering therefore the extensive discussion of the applicable cases, both in the *Stein* case and the *Spaulding* v. *Douglas Aircraft* case, it seems unnecessary to name or again outline them. They have all been studied, reconsidered, and reanalyzed, together with others not there cited, yet we can not find reason in this case to hold otherwise than we did in the *Stein* case.

We note, however, since the petitioner here heavily stresses the fact of relation here, not between citizen and citizen but between government and citizen, not only that the same was true in the *Douglas Aircraft* and *Stein* cases, but that in various other cases between government and citizen the Supreme Court of the United States has sustained denial of claim of right under the due process clause, because of application of the commerce clause of the Constitution. See *Scranton* v. *Wheeler*, 179 U. S. 141, a suit between a citizen and one Wheeler, superintendent for the United States of certain property, the United States, however, being the real party in interest; also *United States* v. *Chicago, Milwaukee, St. Paul & Pac. R. R. Co.*, 312 U. S. 592 (referring to the right to regulate commerce as "dominant"), and *Union Bridge Co.* v. *United States*, 204 U. S. 364, holding that though a bridge was lawful when erected, such erection was with knowledge of

the "paramount authority" of Congress over navigation. There appears to have been in those cases as much preexisting property or contractual right as contended for here.

If, as held in those cases, property rights, such as riparian rights as to navigable streams, were subject to the paramount rights of the United States under its constitutional right to regulate commerce, we consider the war powers at least as paramount here to contractual rights. Is the individual's right to due process, in a contract forming an integral part of the effort of this nation to survive a catastrophic war—a contract to build a cantonment for soldiers being processed into that war—to have more sanctity, against the war powers clauses, than have property rights (and certainly riparian rights are such) in time of peace as against the commerce clause? We may not logically answer in the affirmative.

*Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, is essentially contrary to the petitioner's argument as to unconstitutional retroactivity of the statute. In that case, too, war powers of Congress were involved; there, too, prior rights were relied on, for Congress was regulating the liquor traffic, as to liquor owned prior to the passage of the act, and it was argued, as here, that "the exercise of the war powers is * * * subject to the Fifth Amendment," and that the restrictions on disposition of liquor acquired before the passage of the act exceed even police powers. Justice Brandeis pointed out that the uncompensated restriction upon the disposition of liquors was less severe than those held permissible upon use of property acquired before the enactment of the prohibitory law, in *Mugler* v. *Kansas*, 123 U. S. 623, and *Kidd* v. *Pearson*, 128 U. S. 1, and held that the Fifth Amendment was not contravened. True it is that, as petitioner points out, the *Hamilton* v. *Kentucky Distilleries* case was not one of contract between government and citizen, yet, Hamilton was collector of internal revenue, and the question of regulation was directly between government and citizen; and in *Lynch* v. *United States*, 292 U. S. 571 (579), strongly relied on by the petitioner as against impairment of Government contracts, the Court, after recognizing such sanctity, added, almost as if anticipating a case such as this: "unless, indeed, the action taken falls within the federal police power or some other paramount power." It then further added that it had not there been suggested "that there were supervening conditions which authorized Congress to abrogate these contracts in the exercise of the police or any other power." If any supervening conditions thus tacitly recognized as affecting contracts could be more powerful than those involved in the recent war, we can not vision them. In *Steuart & Bro.* v. *Bowles*, 322 U. S. 398 (405), the Court,

with reference to diversion, under war powers, of fuel oil in which the plaintiff had been dealing, said:

\* \* \* From the point of view of the factory owner from whom the materials were diverted the action would be harsh. He would be deprived of an expected profit. But in times of war the national interest cannot wait on individual claims to preference. The waging of war and the control of its attendant economic problems are urgent business. \* \* \*

So here, the petitioner is, so far as his contractual rights are affected, "deprived of an expected profit." Yet "contracts must be understood as made in reference to possible exercise of rightful authority of government, and no obligation of a contract can extend to the defeat of legitimate government authority," *Louisville & Nashville R. R.* v. *Mottley*, 219 U. S. 467. The principle appears to us to apply equally to contracts between government and citizen, though the cited case was not such.

The petitioner urges strongly, however, that it was not necessary to make the Renegotiation Act retrospective, however great the exigencies of war, and that the war effort was not aided by such statutory retrospectivity and, therefore, it was invalid. That argument seems to us one directed against the policy and wisdom, rather than the constitutional power, of Congress; and such wisdom is "none of our concern"; *Bowles* v. *Willingham, supra; Norman* v. *B. & O. R. Co., supra,* and "Congress might well have thought so"—thought that retroactivity was an aid to the war effort—in fact, it obviously did so think. If Congress saw reasons why the sinews of the nation could be strengthened against its enemies by letting the statute look backward as well as forward, it is not ours to dispute it, unless we find arbitrary and capricious action by Congress. This we can not do under the evidence before us. When we see fifty billions in Government contracts outstanding at the date of the act, observe the petitioner agreeing that regulation of war profiteering is within the general war power of Congress, and find that intangible but powerful element, soldier morale, involved in Congressional consideration of war profiteering, how can we say that Congress was arbitrary or capricious in affecting any profiteering found in those fifty billions and saving money which might conceivably be the deciding element in the war?

Nor does the evidence here demonstrate that it was capricious or arbitrary to regard war profiteering as at least possible, though contracts were upon competitive bids, as the petitioner appears to think. The background of competitive bidding was a state of flux, if not confusion, in matters of materials, labor, and prices, of unheard of demands for amounts and kinds of articles desired, of unprecedented stress in the time element, with production, almost at all cost, in effect, the watchword. The fact of only one bid against the petitioner on area C, and none on E (in a contract involving nearly $7,000,000) is

to us indication of the state of competition in the industry. In this time of peace we appear too often incapable of remembering or realizing the appalling danger weighing upon the nation early in 1942, when enemies were rampantly successful, our Navy largely wrecked, our Army puny in comparison with those of our enemies, in fact, our potential industrial might almost our only defense. The alternative to success was before our eyes, in the sad state of those nations who had succumbed to our eager enemies. Surely judicial knowledge encompasses these facts. Can we now hold that Congress had no reason, but caprice, in extending an anti-profiteering statute over preexisting contracts, including those where there was some competition? We think not. All competitors, all estimators, including those for the Government, were in the same general situation of uncertainty of supplies, costs, and labor and faced with the same necessity for speed.

Though the petitioner suggests that it was not necessary to make the statute retroactive in order to speed the war effort, we think the speed-up involved in the war effort definitely affected the availability of labor and materials, highly important in industry, including building construction, and therefore, at least within a noncapricious view by Congress, at least a potential cause of profiteering, and that retroactivity to affect profiteering might be considered to assist the war effort.

Likewise, we can not agree that military morale might not reasonably be viewed by Congress as affected by renegotiation of past as well as future contracts. Fifty billion dollars in contracts is no small proportion of the total cost of the war, and Congress may have thought that service men demanded a stoppage of all profiteering, even if possibly already arranged for by contract, and that those who might, and later often did, give their last ounce of blood and life would not calmly view insistence by another on his pound, under contract, and might react accordingly in the will to win a war the nation had to win.

"The test of validity in respect of due process of law is whether the means adopted are appropriate to the end." *Helvering* v. *City Bank Co.*, 296 U. S. 85 (90). *Nebbia* v. *People of the State of New York*, 291 U. S. *F*02, cited by the petitioner, says:

    \* \* \* And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under different circumstances, because the reasonableness of each regulation depends upon the relevant facts.

We can not say the Renegotiation Act was not appropriate to the end of winning the war and preventing profiteering, that the law has no real and substantial relation to the object sought to be attained, or

that the relevant facts here at hand demonstrate unreason, arbitrariness, or caprice. To us it seems that in the Renegotiation Act, an act such as the *Bethlehem Steel* case considered necessary, and one particularly providing retroactivity, Congress has done less than that case said it could do, "draft business organizations to support the fighting men who risk their lives," just as it could "draft men for battle service"—regardless of the previous contracts of such men. Indeed, the Court denominates such power to draft business as "no less" than that of drafting men. Realism requires that we see grave possibilities, if not probability, of profiteering in such a condition of industry at war, and at least potential grave effect on the war, even from any profiteering already embodied in contracts; moreover, that we see the matter as one of the wisdom, and not of the power, of Congress.

The petitioner suggests that Congress did not intend the Renegotiation Act to be retroactive in effect, and cites Congressional discussions which do indeed disclose difference of opinion in that body on the subject. But, since the act as finally passed affirmatively and clearly states that it is to be applicable to contracts "heretofore made," we accept it as written. We find no reason, in the face of such language, to conclude that it does not represent the final majority view of Congress. Therefore, we conclude that the petitioner's argument should not be given weight here.

The argument for unconstitutionality because of the power in the Tax Court of the United States to decide finally, and without review by other court, the amount, if any, of excessive profits was decided in the *Stein* case; and that as to burden of proof on the petitioner was there also decided against petitioner's contention, and the burden was left on the petitioner in *Nathan Cohen*, 7 T. C. 1002; and further examination of those questions, in the light of the arguments now advanced, reveals to us no reason for different conclusions. Likewise, the contention, in substance, that the Government is estopped under the facts in this case is not well based. If Congress had the war power to make the law retroactive, we discern nothing in the facts here to sustain estoppel.

We agree with the petitioner's view that the Renegotiation Act is not a revenue measure. Nothing in the act indicates it to be such. This conclusion disposes also of the petitioner's suggestion that the contract provides that any increase in Federal taxes (other than net income and undistributed profits) should be added to the contract price, therefore tax exemption was, in effect, granted. No tax being here involved, no tax exemption could be.

Therefore, after study of all the cases touching the constitutionality question, though not citing or reciting them here because of their compilation in previous cases, we come to the conclusion and hold that

the petitioner has not shown the Renegotiation Act, retroactively applied to the contract here involved, to be unconstitutional.

This leaves for consideration the factual problem as to whether the petitioner's profits were excessive, within the purview of the act, and, if so, to what extent. This has entailed the study of voluminous evidence, to detail which is considered neither necessary nor proper. The Renegotiation Act provides, section 403 (a) (4) (A), that in determining excessive profits there shall be taken into consideration the following factors:

(i) efficiency of contractor, with particular regard to attainment of quantity and quality production, reduction of costs and economy in the use of materials, facilities, and manpower;

(ii) reasonableness of costs and profits, with particular regard to volume of production, normal pre-war earnings, and comparison of war and peacetime products;

(iii) amount and source of public and private capital employed and net worth;

(iv) extent of risk assumed, including the risk incident to reasonable pricing policies;

(v) nature and extent of contribution to the war effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(vi) character of business, including complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(vii) such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

We have considered and applied those elements. Most of them may be disposed of briefly. The efficiency of the petitioner in the execution of the contracts, as we view the evidence, was somewhat above average, but not of such character as greatly to affect the conclusion here, either for or against the petitioner. The petitioner furnished its own capital, establishing a credit of $300,000 of which it utilized only $100,000. It received no public assistance as to capital. With regard to the nature and extent of contribution to the war effort, including inventive and developmental contribution, we discern nothing important. Though there was use of efficient methods such as "sump" draining of soil, use of gangs, balloon type construction, etc., none of these methods were new contributions to industry, invention, or the war effort. The "character of business including complexity of manufacturing technique" was simple, involving construction of common barracks in a soldiers' cantonment. In consideration of "reasonableness of costs and profits, with particular regard to volume of production, normal pre-war earnings, and comparison of war and peacetime products," the nature of petitioner's production appears much the same in peace and in the war contracts herein involved, with the volume much greater than in peacetime, since we see the petitioner

engaged on these contracts to the extent of approximately 7 million dollars, whereas the extent of contracts in which Morris J. Ring, petitioner's president, had been involved through about 20 years, after 1922, was from 25 to 30 million dollars. The petitioner was organized in 1934, and in 1938–1941, inclusive had contracts totaling $4,665,000, with job profits of $546,000.

The reasonableness, or excessive nature, of costs and profits in this matter is argued by the petitioner largely upon the basis of the risk assumed, and, in the absence of any other particular or unusual nature of the contract involved, or inventive or technical contribution to the war effort which would logically appear to weight greatly the question, we think the matter does turn primarily upon the element of risk taken. It is stipulated that the petitioner bid a total $6,728,580 on the two contracts, that it received for performance thereof $6,918,988.51, that the actual allowable and reasonable job costs (exclusive of certain elements hereinafter considered) were $4,936,172.52, including $2,-949,706.03 paid subcontractors. This leaves a difference between such job costs and price received, of $1,982,815.99. This amount, less $23,500 for services of Wiik and Floyd, or $1,959,315.99, the respondent contends is the profit involved, and that it is excessive to the extent of $1,405,000 (or $1,365,000 after effect of $40,000 Wisconsin income taxes), the respondent thus contending that the reasonable profit to the petitioner is not greater than $554,315.99 (after the Wisconsin income taxes are considered). The petitioner contends that the profit made is reasonable, and in particular that job costs should include $102,388.91 contracted to be paid Wiik and $110,275.32 under contract with Floyd; also approximately $40,000 spent in 1943 for expenses of litigation, salaries, and other expense connected with the renegotiation and contended to be proper costs thereof. The petitioner contends that it has a net profit to date of trial of $1,564,466.60, but that Federal income taxes of $1,071,155.76 should be deducted, tentatively, in making our determination here, leaving petitioner $493,310.84; and that before Federal taxes and after a fair allowance for reasonable costs estimated at the beginning of the job, its actual profit was $859,998.60, or about 12.43 per cent of the total contract price. Thus it is seen that the respondent is in effect urging allowance of a profit of about 10 per cent of actual costs, while the petitioner seeks profit based on costs as estimated and consideration of income taxes to be paid (in addition to the Wiik-Floyd contracts and the 1943 expenses), and, as already indicated, places particular stress on the risk assumed. After consideration of the evidence, both factual and based on opinion, on this subject, which it would serve no purpose to discuss at length, we can not share the petitioner's view that the risk assumed, or other facts, justified the profit made on the contract at hand here. Undoubtedly,

risk is an element to be considered, but, with convincing evidence before us that a contractor "feels very happy to make his ten per cent gross job profit * * * on your costs," other evidence that a reasonable profit is 10 per cent, still other testimony indicating that the profit should be from 10 to 13 per cent, added to costs figured, including ordinary hazards, or well known and expected contingencies, our question is largely whether to base profit on actual costs or on costs estimated in bidding, with addition for unknown hazards. We have come to the conclusion, from comparison and analysis of all of the evidence, that actual costs should be the basis. The average or ordinary contractor's profit is a safe guide here, though he sometimes makes more, or less. We are not convinced that the petitioner assumed more risk than the ordinary contractor, and if, as we believe from the evidence, a contractor ordinarily is satisfied on a profit of 10 to 13 per cent above his costs expended, it appears that his risks are intended to be covered in such profit above actual costs. Otherwise a contractor would not reasonably continue in business. In addition, here a great part of the job was subcontracted to subcontractors under bond, and, though we realize bonds can be useless, that is the usual method and protection, and the petitioner seems to us to consider too much the risk element. It is not shown that any subcontractors defaulted on the job with loss to the petitioner. Moreover, we think that the costs computed in bidding were high, not only because of the general uncertainty of war market and labor conditions, but because Morris J. Ring expected to reduce them greatly by shopping among or haggling with subcontractors—a practice, under the evidence, causing subcontractors in general to bid high or refrain. He testified that he actually did so shop or haggle, and the sub-bids were thus reduced about $600,000. These facts, with his testimony that he had certain favored subcontractors, convince us that Ring had reason to believe that there would not be the expense which had been estimated and included in the bid. We do not believe that the petitioner's organization or president actually erred so much in placing the estimates so high. The petitioner always gets additional bids after a contract is let. We think all these facts bear much on what profit made here should be regarded as excessive. Without further discussion, and evaluating as best we can the varied evidence, and giving all weight deemed appropriate to risk, we hold that, subject to details hereinafter discussed, the petitioner's reasonable profit was $600,000 or a little less than 12 per cent of the actual costs of the jobs, amounting to $5,069,058.57.

In the compilation of such costs, question arises first as to the amount to be deducted as compensation for Floyd and Wiik. The respondent adduced evidence that their services were worth $1,000 a month each, and is willing to deduct $23,500; while the petitioner contends that

under their contracts they were entitled to a total of $212,664.23 and that amount should be deducted. Section 403 (d) of the Renegotiation Act provides that compensation to employees shall not be deducted in more than a reasonable amount, while section 403 (c) (1) (3) of the act, as amended, provides that the deductions allowed by chapter 1 of the Internal Revenue Code shall be recognized. Regulations 111, sec. 29.23 (a)–6 (2), is to the effect that in general, if contingent compensation is paid, pursuant to previous free bargain, it should be allowed, though it may prove greater than the amount which would ordinarily be paid. We think section 403 (c) (1) (3) and the principle of the regulation apply here. Floyd had worked for petitioner under such contracts since 1939; Wiik, since 1934. In 1940 Floyd earned nothing; Wiik in 1936 only $2,400, and in 1937, $3,000. The contracts we consider to indicate reasonable deductions. We think also that the amounts should be based on profits after renegotiation. The contracts provided, in short, for 10 per cent of net profits, defined as difference between "Contractor's price" and costs. We hold that, considering the contingent contracts, the employees' compensation should be based upon the amount received by the petitioner after renegotiation. This is in accord with the decision in *Floyd* v. *Ring Construction Co.*, 66 Fed. Supp. 436, where Floyd sued petitioner, asking for compensation based upon net profits prior to renegotiation. In other words, we hold that deduction for compensation for the two employees, together, is $60,000, 10 per cent of $600,000 remaining to petitioner after renegotiation.

The respondent says there is no evidence of the reasonable compensation to Morris J. Ring and his two sons, therefore no consideration should be given to deductions in that regard. As to the sons, we agree. Nothing whatever of record permits us to evaluate their services. As to Morris J. Ring, we do not so agree. Though there was no direct evidence of reasonable compensation, there was ample evidence of his work and his very long hours, and his salary had been $35,000. We approve deduction, as to him, of $35,000, considering the overtime and respondent's assumption, as to Wiik and Floyd, that nine months were spent on the job.

The petitioner urges deduction, as costs of the job, of approximately $43,886 spent in 1943 having connection with the renegotiation, the amount and reasonableness being stipulated. The respondent contends that the $43,886 is mere corporate expense, but not costs of the job entering into determination of profits. We think that view is properly sustained only in part. The item of legal expense in contesting the renegotiation and legal expense in the case of *Floyd* v. *Ring*, amounting to $6,000, we consider no proper deduction. We are to determine the excess profit in "profits derived from contracts with

the Departments and subcontracts," which under the statute means "the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred *with respect thereto.*" (Italics supplied.) We think the above $6,000 may not be considered with respect to the contracts. Even if that portion thereof expended upon the case of *Floyd* v. *Ring* be considered proper job cost, we have in the record no way to allocate it, having only the lump figure $6,000 for the two items of legal expense in contesting renegotiation and in *Floyd* v. *Ring.* The other items, totaling $37,886, do, in our opinion, qualify as with respect to the contracts; for it was agreed at trial that the items were expended in "cleaning up the office work necessary in connection with this job even though it had been completed." Though the language was general, we think it may properly be applied only to the $37,886. The $6,000 is denied deduction. For Floyd and Wiik, Ring, and the later expense we therefore add a total of $132,886 to the $4,936,172.52 stipulated expenses, arriving at total expense of $5,069,058.57, which, subtracted from receipts of $6,918,988.51, leaves $1,849,929.94 profit.

The parties have agreed that our conclusions herein are subject to adjustment because of the amount of tax credits when definitely ascertained, and that a second order will then issue after submission of the necessary facts as to such taxes. Subject thereto, we determine that the profit of the petitioner on the contracts here involved was excessive to the extent of $1,249,929.94, within the intendment of the Renegotiation Act.

Reviewed by the Court.