NATIONAL ELECTRIC WELDING MACHINES CO., A MICHIGAN CORPORATION, PETITIONER, *v.* HENRY L. STIMSON, SECRETARY FOR THE WAR DEPARTMENT, AND ROBERT P. PATTERSON, UNDER SECRETARY FOR THE WAR DEPARTMENT, RESPONDENTS.

Docket No. 10–R. Promulgated January 13, 1948.

50

*Selwyn A. Lambert, Esq.*, and *William M. Aiken, Esq.*, for the petitioner.

*Julian R. Wilheim, Esq.*, and *Robert H. Winn, Esq.*, for the respondents.

**OPINION.**

OPPER, *Judge*: All of the questions involved in determining this controversy as to the excessive character of petitioner's wartime prof-

its under the Renegotiation Act are issues of law. Those we find it necessary to decide are three questions of statutory construction and a related issue dealing with the constitutionality of one of the applicable provisions.

A number of petitioner's contracts were not made directly with a "Department," as that was defined under the Renegotiation Act in its earliest form.[1] They were made with the Defense Plant Corporation, a subsidiary of the Reconstruction Finance Corporation and a Government agency. It was not until July 1, 1943, that the Renegotiation Act was expressly amended so as to include among renegotiable contracts those made with DPC. Petitioner contends, first, that the act did not theretofore include DPC contracts and, second, that as amended in 1943 it was not intended to include them retroactively. We consider it necessary to dispose only of the latter question.

The precise language by which DPC contracts were incorporated in the Renegotiation Act was as follows:

* * * clauses (1) and (2) of subsection (a) of section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, are amended to read as follows:

SEC. 403. (a) For the purposes of this section—

1. The term "Department" means the War Department, the Navy Department, the Treasury Department, the Maritime Commission, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company, respectively.

2. In the case of * * * Defense Plant Corporation * * * the term "Secretary" means the board of directors of the * * * corporation.

But Congress did not content itself with that provision. It added a further amendment as subsection (k) of the same section, reading as follows: "(k) *All* the provisions of this section shall be construed to apply to Defense Plant Corporation * * *"

Among the provisions of section 403 thus made applicable to DPC is the following language in subsection (c) (1):

Whenever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized from *any* contract with such Department, or from *any* subcontract thereunder whether or not made by the contractor, may be excessive, the Secretary is authorized and directed to require the contractor or subcontractor to renegotiate the contract price.

the following language in subsection (c) (2):

Upon renegotiation, the Secretary is authorized and directed to eliminate *any* excessive profits under such contract or subcontract * * *

and the statement contained in subsection (c) (6) that:

This subsection (c) shall be applicable to all contracts and subcontracts hereafter made and to *all* contracts and subcontracts heretofore made, *whether or not such contracts or subcontracts contain a renegotiation or recapture clause,* un-

[1] SEC. 403. (a) For the purposes of this section, the term "Department" means the War Department, the Navy Department, and the Maritime Commission, respectively; * * *

less (i) final payment pursuant to such contract or subcontract was made prior to April 28, 1942 * * *. [²] [Emphasis in each case added.]

We think it evident that both the structure of the statute and the requirement that legislative language shall be deemed to have had some purpose require the interpretation that the amendment including DPC contracts was intended to be retroactive to the date of the enactment of the original Renegotiation Act. No other reason for the additional language contained in subsection (k) is apparent. If the only purpose to be served had been to include DPC contracts prospectively, that would have been accomplished by the amendment to section 403 (a) (1).

The administrative officers, charged with the enforcement of the provision and who were obviously familiar with its purpose and immediate history, accepted this as the required construction. See *Great Northern Railway Co.* v. *United States*, 315 U. S. 262, 275. This appears also from the testimony of Mr. Jesse Jones before the Ways and Means Committee of the House given (September 10, 1943) shortly after the passage of the 1943 amendment. Mr. Jones there stated:

* * * The amendment suggested for use, in the event the Congress wished to make subject to renegotiations the R. F. C. subsidiary contracts under which final payment had not been made prior to April 28, 1942, was added in conference on the Military Appropriations Act of 1944. I call attention to this particularly since it seems to me to clearly evidence the intention of the Congress that the amendment was to be retroactive in its application to the contracts of the four R. F. C. subsidiaries.

Mr. Jones made reference to a letter written while the bill was in conference to the chairman of the Senate Appropriations Committee, which was annexed as an exhibit to this testimony.[3] Hearings before the Committee on Ways and Means, House of Representatives, 78th Cong., 1st sess., on H. R. 2324, H. R. 2698, and H. R. 3015, pp. 187, 200.

Since the purpose of the hearings and the consideration of the Congress in that connection was directed to possible further amend-

---

[2] The quotation is from the original Renegotiation Act (Public Law 528, 77th Cong., 2d sess.), April 28, 1942, as amended by Public Law 753, 77th Cong., 2d sess., October 21, 1942, the only change of consequence in the quoted subsections being that the specific date was inserted in the amendment in lieu of the original provision reading: "This subsection shall be applicable to all contracts and subcontracts hereafter made and to all contracts and subcontracts heretofore made," etc., in the original act.

[3] The letter read in part:
"It is, of course, a matter for Congress to determine to what extent, if at all, the statute is to apply to uncompleted contracts of subsidiaries of the Reconstruction Finance Corporation. If the Congress selects the date, April 28, 1942, as contained in the present statute, the following amendment which would immediately follow the above proposed amendment to H. R. 2996, is presented for your consideration:

" 'Section 403 of the Sixth Supplemental National Defense Appropriation Act, as amended, is further amended by adding at the end thereof the following subsection:

" ' "SUBSECTION (k). All the provisions of this section shall be construed to apply to Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company." '

"Should the Congress, however, determine that the renegotiation statute should apply to contracts of R. F. C. subsidiaries uncompleted as of a different date than that now contained in the statute, the following amendment is presented for your consideration:"

ments to the renegotiation provisions, it may be added that, had the construction immediately attributed to the legislation by the administrative officers involved and forthwith brought explicitly and forcibly to the attention of the same Congress, been contrary to the congressional purpose, it seems highly improbable that the subsequent amendments would not have taken occasion to correct the interpretation adopted. We conclude that, regardless of the proper construction of the act between April 28, 1942, and July 1, 1943, the 1943 amendment and its retroactive operation require that petitioner's contracts with DPC, not fully paid for prior to April 28, 1942, be regarded as renegotiable.

Petitioner's insistence upon the unconstitutionality of the renegotiation legislation, if applied to it, presents nothing essentially novel. It is true that some of its contracts with DPC were paid for before July 1, 1943, when the statute was amended to include an express reference to such contracts. But it is not true that the effect of that phase of the Fifth Amendment which forbids the taking of private property for public use without just compensation is without previous consideration in renegotiation cases. In *Stein Brothers Manufacturing Co.*, 7 T. C. 863, 878, we said:

The petitioner claims that the Renegotiation Act is unconstitutional as applied retroactively to two contracts entered into and wholly or partially performed before April 28, 1942, the effective date of the Act, even though payments were received on those contracts after that date. They contained no clause authorizing renegotiation * * * This, the petitioner says, takes its property without due process of law or *just compensation* in violation of the Fifth Amendment to the Constitution of the United States. * * * [Emphasis added.]

This argument was not disregarded in concluding in that case that the retroactive application of the Renegotiation Act was not unconstitutional, as must be gathered from the following language (p. 878):

* * * all of its assignments [of error] and arguments have been carefully considered. The ones upon which it seems to place the greatest reliance are discussed herein, but none has been overlooked. We are unable to agree that the act is unconstitutional for any of the reasons advanced.

Congress, we there said (p. 879), might, indeed, "have gone even further in applying the act retroactively. If the power exists, it is complete enough to prevent all war profiteering."

The fact that some of petitioner's contracts were paid for in full before July 1, 1943, but after April 28, 1942, presents a distinction in fact, but no difference in principle. In the *Stein* case petitioner argued (p. 878) "that the Government can not retroactively repudiate its obligation for accepted goods which had already arisen under those valid contracts." But it is elementary that a contract and the right to perform and collect under it are property within the meaning of the Fifth Amendment. *Lynch* v. *United States*, 292 U. S. 571. In *Ring Construction Corporation*, 8 T. C. 1070, 1081, which also upheld the constitutionality of the renegotiation statute, respondent did "not

argue that a contractual right is not a property right." Referring to *Perry* v. *United States*, 294 U. S. 330, we recognized that that case sustained the contractual effectiveness of the gold clause as between Government and citizen, but added (p. 1081): "The case, however, involved no application of the war powers of Congress, and offers no assistance here."

We think it follows that the mere distinction between a contract completely performed but not yet paid for, and one where the profits have already been collected by the contractor can not justify the distinction between the *Stein* and *Ring* cases and this proceeding. Contracts completely paid for prior to April 28, 1942, are excluded from the operation of the Renegotiation Act not because its application to them would constitute an unconstitutional exercise of legislative power, but because the statute itself selects that date as the barrier between renegotiable and nonrenegotiable business. As we have pointed out, no similar action was taken in connection with the amendment applying to DPC contracts. We have already expressed our view that, on the contrary, Congress affirmatively selected for the effective date of the amendment the same date as that applicable to the original act. We are not prepared to say that legislation, which is constitutional when referring to a completed contract as to which all that remains is the collection from the Government of the payments due, goes outside the scope of the Government's war powers when the profits said to be excessive have found their way into the contractor's hands.

If the concept of a taking of private property for public use governs in such a case as this,[4] it must be thought to relate in reality not to the contract, nor to the rights thereunder, nor to the funds employed by the Government to make payment; but rather to the war products which were essentially the subject matter of the contract and the consideration for the payment. As to these, this very proceeding has a part in the process of determining what is just compensation. As soon as it is concluded from the operation of the judicial process that the payment made or contracted for was "excessive," the matter of just compensation has been disposed of. It would require the compatibility of incompatibles to conclude that the Nation must permit a war contractor to retain "excessive" profits in order to assure him "just" compensation. We conclude that the determination in this proceeding that petitioner realized excessive profits on contracts made with DPC and paid for between April 28, 1942, and July 1, 1943, does not violate any constitutional safeguard to the protection of which petitioner is entitled. *Stein Brothers Manufacturing Co.*, *supra; Ring Construction Corporation*, *supra*.

---

[4] Collection of the disputed payments was made in this case by offset against other moneys due petitioner. There was no physical "taking" of the original payment.

Certain other sales were made by petitioner, not to any Government agency, but to civilian producers having prime contracts subject to renegotiation. As to these the question is whether they were "subcontracts," within the meaning of the Renegotiation Act. Petitioner contends that those for which payment was completed prior to October 21, 1942, are not renegotiable because not until then was the word "subcontract" so defined in the Renegotiation Act as to include sales of productive equipment to a prime contractor, and that the amendment of that date was not intended to be retroactive.

But we take the view that the amendment[5] was not designed to change the existing law, but merely to declare and clarify it, and that the term "subcontract" was used from the beginning with a breadth sufficient to cover the articles sold by petitioner.

In the first place the language used by Congress demonstrates its intention to exercise its power to the broadest possible extent within the field it purported to cover, eliminating only contracts completed and paid for before the original Renegotiation Act was passed. *Supply Division, Inc.*, 9 T. C. 1103; cf. *Helvering* v. *Stockholms, Enskilda Bank*, 293 U. S. 84. In the statutory language already quoted in the discussion of the prior issue, the legislators referred to "any subcontract thereunder," that is, any subcontract under "any contract" with a Department.

In the second place, the purpose to be served and the mischief at which the legislative remedy was aimed required that the term "subcontract" be used so as to sweep into the scope of the legislation all activities directly related to production for the war-making Departments.[6] Clearly this could not be done without including machinery constructed and bought primarily for the purpose of producing products with a war-end use. In neither of these respects is the present proceeding comparable to *Aluminum Co. of America*, 47 B. T. A. 543, which involved not the Renegotiation Act, but the Vinson-Trammell Act, although it is to be noted that even this decision was disapproved on review (C. C. A., 3rd Cir.), 142 Fed. (2d) 663 (certiorari denied, 323 U. S. 728). And see *Grob Brothers*, 9 T. C. 495; *Supply Division Inc., supra.*

---

[5] Revenue Act of 1942 (Act of Oct. 21, 1942), sec. 801, amending Sixth Supplemental National Defense Appropriation Act to read as follows:

"SEC. 403. (a) For the purposes of this section—

  *       *       *       *       *       *

"(5) The term 'subcontract' means any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of another contract or subcontract. The term 'article' includes any material, part, assembly, machinery, equipment, or other personal property.

"For the purposes of subsections (d) and (e) of this section, the term 'contract' includes a subcontract and the term 'contractor' includes a subcontractor."

[6] Mr. Cannon reported for the House conferees:

"Mr. Speaker, this provision proposes to limit profits on war contracts.

"In every war there have been men who made an unconscionable profit out of the national misfortune   *   *   *.  With that in view there has been a general understanding from

In the third place, the administrative construction adopted under the language of the original act and prior to the amendment, and which represented the view of the officers of the War Department most intimately acquainted with the legislation, included in its definition of the term "subcontract" "any purchase order from, or any agreement with, the contractor * * * to make or furnish any articles acquired by the contractor primarily for the performance of this contract * * *. The term 'articles' includes any * * * machinery, equipment or other personal property." War Department, Price Adjustment Board, "Principles, Policy and Procedure To Be Followed in Renegotiation," Aug. 10, 1942, p. 7. It was this very position on the part of the administrative officials which led to the adoption of the amendment. The definition was resisted by some contractors, partly on the authority of the *Aluminum Co.* case, and for that reason the War Department requested that Congress put the matter beyond doubt by inserting the clarifying provision. Hearings before the Committee on Finance, United States Senate, 77th Cong., 2d sess., on section 403 of Public Law Numbered 528 (Sept. 22 and 23, 1942), p. 37 *et seq;* Hearings before a Subcommittee of the Committee on Finance, United States Senate, 77th Cong., 2d sess., on section 403 of Public Law Numbered 528 (Sept. 29 and 30, 1942), p. 22 *et seq.* While there was some disagreement among the War and Navy Departments and the Maritime Commission as to the precise language to be used, the Government agencies ultimately composed their differences and agreed upon wording which was in that very form enacted as the amendment. The administrative construction already adopted having been called to the attention of Congress and having in fact constituted an impelling cause for consideration of the question, it seems hardly conceivable that, had the interpretation which the legislation had already received been contrary to that originally intended, the amendment would have been adopted at all, or at least in its unrestricted scope. It would have been a simple matter to have included either in the legislation itself or in the material submitted by the respective committees an admonition that the amendment constituted new legislation and hence should be applied only with a prospective effect.

Finally, we take occasion to note that the question here is different from that presented under the first issue. The provision there involved

the beginning that no one shall make undue profits out of the sacrifices which every citizen is required to make to win this war * * *." (Congressional Record, House, April 21, 1942, p. 3697.)

Senator McKellar reported for the Senate conferees:

"* * * I asked the representatives of the three departments concerned if they would not go back to their offices and prepare an amendment dealing with the question of profits which would be workable * * *. The amendment in the conference report is substantially and really the amendment prepared by the representatives of these three departments, and I think I can say it has been very well prepared." (Congressional Record, Senate, April 23, 1942, p. 3763.)

included a definition of the word "Department," which might at least colorably be taken to mean that situations not falling within the defining language were to be excluded; while here, the absence of any definition at all is no less consistent with a use of the word in its broadest possible scope as with any other interpretation. We conclude that the term "subcontracts" must be construed as including, from the effective date of the orignal act,[7] such sales as those made by petitioner not paid for prior to April 28, 1942.

It seems equally clear that petitioner's machines were "required" for the performance of the prime contracts within the purview of the Renegotiation Act.[8] Petitioner's suggestion that "the sales price of the machines petitioner sold its commercial customers never figured directly in Government costs and had no more bearing on such costs than the sales of machines sold years before the war" is at best a supposition without facts to support it, or, what seems more reasonable, is an entirely unwarranted assumption. As petitioner itself points out, the cost of capital equipment would be reflected in the charges for depreciation which the prime contractor would include both in its original cost accounting and in any renegotiation directed to it. Machines purchased prior to the emergence of war conditions and inflated costs could not reasonably be expected to have the same treatment by Congress as necessary equipment and materials "required" by a prime contractor for its war work and obtainable by it only at possibly excessive prices and upon the payment of possibly unreasonable profits.

Nor does the suggestion that such products were also sold for civilian production under price ceilings, even if that be the fact, meet the issue. Whether the costs of war material became excessive because of the volume of production created by the war demand is no more answered by the application of civilian price ceilings than is the similar proposition that a war contractor's profits would not be unreasonable if its quantity prices to the Government were no higher than the peacetime level. See "Joint Statement of the War, Navy, and Treasury Departments and the Maritime Commission, Purposes, Principles, Policies, and Interpretations," etc. (March 31, 1943), p. 7; see *Stein Brothers, supra,* p. 886; *Ring Construction Corporation, supra,* 1087; *Western Precipitation Corporation,* 9 T. C. 877. And, as we have already had occasion to observe, the legislative history, far from supporting petitioner's position, indicates that Congress proposed to attack the entire problem of costs directly related to the price charged by a prime contractor for products needed by the warmaking Departments for the prosecution of the war.

---

[7] On this disposition of the preliminary issue no constitutional question of retroactivity arises. Petitioner reserves a contention similar to that advanced in *Stein Brothers Manufacturing Co.* and *Ring Construction Corporation, supra,* but recognizes the controlling effect of those decisions here and makes no effort to reargue the principle there laid down.

[8] See footnote 5, *supra.*

Petitioner's contention is essentially that advanced by the machine tool manufacturers and rejected by the ultimate legislative conclusion.[9] We are satisfied that petitioner's sales to civilian holders of prime war contracts were subcontracts subject to renegotiation under the statute.

As the final issue is framed, it also presents exclusively a question of law. Petitioner's contention is thus stated in its brief:

Petitioner now argues alternatively that if its orders from private corporations are renegotiable at all, orders for complete machines are *renegotiable only* to the extent that the machines were used on renegotiable business. [Emphasis added.]

This aspect of the proceeding has two phases, but only one is in controversy. The parties have agreed as to the relationship between the renegotiable and nonrenegotiable business engaged in by petitioner's customers at the time it made the sales, and respondents now concede that an allocation of petitioner's profits may be made accordingly, thus eliminating a percentage of its profits so computed from respondents' claim. To this extent they accept the applicability of rulings of the War Contracts Price Adjustment Board, par. 322.3 "Joint Renegotiation Manual, approved effective January 27, 1944, by the Joint Price Adjustment Board"; see also "Joint Statement by the War, Navy and Treasury Departments and the Maritime Commission, Purposes, Principles, Policies, and Interpretations," etc., (March 31, 1943), p. 10, and on this point there is no issue.

But petitioner also insists that the stipulated fact of the estimated total useful life of the machines compared to the portion of that life during which the war continued entitles it to have eliminated, as being beyond the scope of the renegotiation statute, a comparable proportion of its profits from these sales. We think it vital to emphasize this reliance upon the nonrenegotiability of such business as a matter of law. The position amounts in essence to the proposition that some part of the profits concededly realized by petitioner from sales of machines actually used for war production may not legally be scrutinized for the purpose of determining the extent to which its profits were in fact excessive.

This emphasis seems to us necessary to distinguish what might

---

[9] In connection with the Revenue Bill of 1943 a "new" definition of subcontract was proposed:

"Under the *new* definition of subcontract, *factory supplies such as tools or equipment,* typewriters, business machines, etc., are exempt from renegotiation. * * *" (Rept. No. 871 on H. R. 3687, 78th Cong., 1st sess., p. 78.) (Emphasis added.)

An amendment to the Senate bill, however, offered by the Committee on Finance on the floor of the Senate "would restore the provision of existing law * * *. Of course, that would have the effect of throwing the issue into conference." Cong. Rec. Senate, Jan. 21, 1944, p. 561. In conference an amendment was agreed to which "restores the language of existing law (the subject of settled administrative construction) * * *. The House recedes with an amendment excluding office supplies * * *" (Rept. No. 1079 on H. R. 3687, 78th Cong., 2d sess., pp. 78–79). It thus appears that amendments proposing to restrict the original definition to the line of petitioner's present contention were never accepted.

otherwise have been a contention of an essentially factual nature. Petitioner is not contending here that its profits were not excessive because to some extent they were due to the filling of civilian needs subsequent to the war. Such a relationship to its peacetime or civilian business could well be an element meriting consideration in the over-all factual determination of the excessive nature of war profits. The statute itself might be said to envisage such consideration.[10] This question is not before us and we do not pass upon it.

We give no consideration, moreover, to the adequacy of the facts shown here for any such purpose. It may well be that the mere proof of anticipated physical life would be insufficient to show the extent of the peacetime influence of the use of such machines upon a contractor's war profits. We are not by the form of the present stipulation faced with an issue of this kind. As a bare legal proposition, we are unable to say that a prophetic pronouncement upon the future use of petitioner's product is necessary to determine any forbidden area of statutory inapplicability of the Renegotiation Act. Except to the extent now conceded, we conclude that petitioner's sales were altogether subject to the statute and to the process of renegotiation thereunder.

The disputed questions of law must all be decided in favor of respondents, and under the formula agreed to by the parties the conclusion must be that petitioner's profits were excessive to the full extent asserted in respondents' answer, as modified by their present concession.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

VAN FOSSAN and HILL, *JJ.*, concur only in the result.

---

[10] See section 403 (a) (4) (A), Sixth Supplemental National Defense Appropriation Act, 1942, as amended by the Revenue Act of 1943.