LEHMANN MACHINE COMPANY, A CORPORATION, PETITIONER, *v.* RECONSTRUCTION FINANCE CORPORATION PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket No. 158–R. Promulgated February 24, 1948.

*Milton Yawitz, Esq.*, for the petitioner.
*Robert H. Winn, Esq.*, for the respondent.

**OPINION.**

LeMire, *Judge*: The petitioner's contentions are that, since its contracts with DPC, which gave rise to the profits in dispute, were fully performed and paid for before the enactment of the July 1, 1943, amendment to the Renegotiation Act of 1942, they are not subject to renegotiation. It contends that the amendment can not be given retroactive application and, if so construed, it is unconstitutional because it results in the taking of private property for public use without just compensation, in contravention of the Fifth Amendment of the Constitution.

Prior to July 1943 the Renegotiation Act did not provide for renegotiation of contracts with DPC. Section 403 (a) of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended by section 801 (a) of the Revenue Act of 1942, provided that: "The term 'Department' means the War Department, the Navy Department, the Treasury Department, and the Maritime Commission, respectively." As further amended on July 1, 1943, the item "Department" was defined as the:

\* \* \* War Department, the Navy Department, the Treasury Department, the Maritime Commission, the War Shipping Administration, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company, respectively.

The question of the applicability of the Renegotiation Act, as amended, to DPC contracts such as those here involved and the constitutionality of the act as so applied, has been ruled upon in several cases previously decided by this Court and need not be discussed at great length here. See *Stein Brothers Mfg. Co.*, 7 T. C. 863; *Ring Construction Corporation*, 8 T. C. 1070; *National Electric Welding Machines Co.*, 10 T. C. 49. The arguments made by the petitioner here are much the same as those made in the decided cases. *National Electric Welding Machines Co.*, *supra*, perhaps bears the closest factual evidence to the instant case. Some of the profits there involved were from DPC contracts fully performed and paid for after enactment of the original Renegotiation Act, but prior to the July 1, 1943, amendment. We held that the act, as amended, is applicable to such contracts and as so applied is not unconstitutional.

We therefore hold that the contracts under consideration are subject to renegotiation and that as applied to such contracts the statute is not unconstitutional.

The more difficult problem here is to determine the amount of excessive profits, if any, which the petitioner realized under its DPC contracts.

It will be noted that the sales under those contracts comprised a little more than one-third of petitioner's total sales for the taxable year 1942, or $976,688 out of a total of $2,851,494.13. The parties have stipulated that the profits on these sales amounted to $263,201. The RFC made a unilateral determination that $83,000 of the $263,201 was excessive profits. The petitioner in its petition filed in this proceeding challenged the constitutionality of the Renegotiation Act, but did not question the determination as to the amount of excessive profits. However, in an amended answer the respondent affirmatively alleged that the petitioner's excessive profits from the DPC contracts were $187,000 instead of $83,000, as determined by the RFC. As to the proposed increase in the amount of excessive profits, the burden of proof rests upon the respondent, while the burden of showing that the original determination is erroneous rests upon the petitioner. *Nathan Cohen* v. *Secretary of War*, 7 T. C. 1002.

It is our opinion that the evidence of record does not afford any basis for setting aside the determination of excessive profits made by the RFC. Section 403 (a) (4) (A) of the statute enumerates certain factors which are to be taken into consideration in determining excessive profits. These are: (1) Efficiency of contractor; (2) reasonableness of costs and profits; (3) amount and source of public and private capital employed and net worth; (4) extent of risk assumed; (5) nature and extent of contribution to the war effort; (6) character of business; and (7) such other factors as should be considered for the public's interest and for fair and equitable dealing.

Petitioner's position with respect to most of the enumerated factors is favorable. The evidence indicates that it operated with normal efficiency; that its costs were held within reasonable bounds; that it furnished its own facilities and capital, using no public capital; and that it contributed to the war effort by supplying vital machine tools of superior quality and in fair quantity, according to its productive capacity. It assumed no unusual risks.

The petitioner urges that among the principal factors to be considered in determining its excessive profits, if any, are: (1) The return of capital expended in the development of the hydratrol lathe; (2) the cyclical incident of the machine tool industry; and (3) the risk of saturation. The petitioner points out that its comparatively large percentage of business, and correspondingly large profits, in

the taxable year 1942 were due in a large part to the sales of the hydratrol lathe which it had recently brought into quantity production. In the evidence before us, however, there is no showing or even an estimate of the cost to the petitioner of developing the hydratrol lathe. We know that for the years 1940 and 1941 the Commissioner of Internal Revenue allowed the petitioner, on its claim for relief under section 721, Internal Revenue Code, to reallocate to prior years a portion of its 1940 and 1941 earnings amounting to $7\frac{1}{2}$ per cent of sales. However, we do not know on what figures or factors that allowance was made. It is evident that the petitioner did not suspend other operations while it was developing and introducing the hydratrol lathe to the trade, since, as the facts show, it had sales of approximately $119,000 in 1936, when it sold only 6 hydratrol lathes, for $23,411; approximately $201,000 in 1937, when it sold 22 lathes, for $81,994; and over $142,000 in 1938, when it sold 9 lathes, for $64,527. At the same time, consideration must be given to the fact that petitioner's 1942 profits were due in substantial part to the manufacture and sale of this new improved type of lathe. Some consideration, perhaps not measurable in dollars and cents, must also be given to the fact, which the respondent recognizes, that the petitioner's business, along with the machine tool industry as a whole, is subject to business cycles in which prosperous periods of one or more years are followed by longer periods of small profits or even losses, depending upon management in each individual case. The peak production period for the petitioner began about 1940, when it sold a total of 106 lathes of all types, against 19 for 1939. It sold 198 in 1941; 240 in 1942; 158 in 1943; 136 in 1944; 207 in 1945; and 86 in 1946. Whether in 1942 there were any indications or reasonable expectations of an approaching "valley" in the petitioner's business cycle which would have justified the petitioner in setting aside any substantial portion of its profits in that year in a contingent reserve; whether in 1942 the industrial demand for the type of lathes manufactured by the petitioner was approaching saturation point; whether the petitioner then had any reasonable grounds for belief that it was facing a prolonged business depression which would absorb a substantial portion of its profits of the war years, and post-war years, are questions that we can not answer on any evidence before us.

The respondent produced two qualified witnesses who, in response to hypothetical questions embodying the essential facts pertaining to petitioner's operations as agreed to by the parties in their stipulations, expressed their opinions as to what portion of petitioner's 1942 profits from the DPC contracts was fair and reasonable. One of the witnesses gave it as his opinion that from $100,000 to $110,000 and the other that from $100,000 to $120,000 of the $263,201 of profits would be

fair and reasonable. A witness testifying on behalf of the petitioner named a much higher figure of from 33⅓ per cent to 35 per cent of sales.

The respondent tacitly concedes on brief that the increased excessive profits of $187,000 proposed in the amended answer are not supported by the evidence of record, but urges that we find that at least $145,000 of the $263,201 of profits was excessive.

As indicated above, we have been unable to find in the evidence before us any convincing proof that the amount of the petitioner's excessive profits from the DPC contracts was either more or less than the amount determined in the renegotiation made by the RFC. We therefore find that the petitioner's excessive profits on these contracts were $83,000.

*Decision will be entered in accordance with the above opinion.*