PROVIDENCE WOOL COMBING CO., INC., PETITIONER, *v*. SECRETARY OF WAR, RESPONDENT.

Docket No. 119–R.   Promulgated May 31, 1950.

*Edwin C. Park, Esq.*, for the petitioner.
*Frederick N. Curley, Esq.*, for the respondent.

988

OPINION.

HARRON, *Judge:* The petitioner, pursuant to section 403 (e) of the Renegotiation Act, as amended, seeks redetermination of its excessive profits, if any, under the Renegotiation Act. The original determination by the Under Secretary of War was made on September 6, 1944. It was a unilateral determination.

This proceeding was submitted for decision prior to the decision by the Supreme Court of the three cases which it decided in its opinion in *Lichter* v. *United States*, 334 U. S. 742. Among those cases was that of *Alexander Wool Combing Co.* v. *United States*, 66 Fed. Supp. 389; affd., 160 Fed. (2d) 103. Reference to the issues involved in the *Alexander Wool Combing Co.* case will be made hereinafter. Since the *Lichter* case disposes of issues relating to the constitutionality of the Renegotiation Act as applied to the petitioner, those issues will be discussed, as far as is necessary, after consideration of other issues.

*Issue 1.*—The pleadings raise an issue relating to the validity of the determinations made by the Under Secretary of War under the method he employed during the renegotiation process. It is alleged that standards were erroneously applied and data was considered which were not disclosed to the petitioner, preventing its making rebuttal, and that the petitioner did not receive a full and fair hearing by the Government administrative agencies. The petitioner contends that the administrative determination should be held to be void.

In making the above contention, the petitioner concedes that a proceeding in this Court is a *de novo* proceeding. Petitioner is concerned chiefly with the question of burden of proof and seeks a ruling that the burden of proof is on the respondent with respect to both the original determinations as well as the affirmative allegation in the amended answer whereby claim is made for increase in the amount of the excessive profits. With this view, we do not agree. See *Nathan Cohen*, 7 T. C. 1002.

In *Lichter* v. *United States*, *supra*, pp. 791, 792, the Supreme Court said that the original administrative determinations "were intended to serve primarily as renegotiations in the course of which the interested parties were to have an opportunity to reach an agreement with the Government," in the absence of which a unilateral determination of excessive profit could be made; that the initial proceeding was not required to be a formal proceeding producing a record for review;

and that, in lieu of such review procedure, provision was made by the Congress for a redetermination of excessive profits, if any, *de novo* by the Tax Court. It is held that the alleged irregularities in the administrative procedure do not render the unilateral determination void. The petitioner has availed itself of the statutory remedy provided by section 403 (e) of the Renegotiation Act by filing a petition for a redetermination in this Court, and has received a hearing in this Court. The respondent has submitted evidence under his burden of proof. Upon all of the evidence adduced, we have made findings of fact, and have considered all of the issues presented by the pleadings. The ultimate decisions are made independently and upon the record made in this proceeding. See *Bibb Manufacturing Co.*, 12 T. C. 665, 672.

*Issue 2.*—The general question under this issue is whether the petitioner was a subcontractor in 1942 under section 403 (a) (5) of the Renegotiation Act, as amended, which provides as follows:

(5) The term "subcontract" means any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of any other contract or subcontract. The term "article" includes any material, part, assembly, machinery, equipment, or other personal property.

For the purposes of subsections (d) and (e) of this section, the term "contract" includes a subcontract and the term "contractor" includes a subcontractor.

The petitioner strongly resists the respondent's determination that it was a subcontractor in 1942. The argument advanced by the petitioner appears to be founded upon two conditions which existed in 1942, as follows: The petitioner was given raw wool in lots to process. No lot of wool, to its knowledge, was earmarked as destined for use in a particular contract, or if it was, the weaving mill could make allocations at will of the wool to be woven into textiles between civilian and Government orders. Therefore, the petitioner alleges it could not determine what the end use of the wool was. From this, the petitioner argues that it did not perform work on material *"required"* for the performance by others of contracts or subcontracts with the Government; that the term "required" does not mean end use; and that it should not be classed as a subcontractor because others *ultimately* used some of the wool it processed to fill Government orders. To do so, it is argued, would be to ascribe to petitioner the status of subcontractor upon the basis of decisions relating to allocations of wool over which it had no control, and of which it alleges it had no knowledge until after the fact. The petitioner contends that the "Government cannot consistently with due process create a liability on the part of one person dependent upon the subsequent acts of other persons beyond his control," and that the liability which the respondent's determination imposed was in substance a penalty for acts "lawful"

when done by reason of subsequent events; that the Congress can not retroactively impose upon persons a penalty for making sales of their property for public use at fair market values and at lawful prices.

The petitioner contends, also, that the term "subcontract" in the amended provisions of section 403 (a), subsection (5), section 801 of the Revenue Act of 1942, Title VIII, enacted on October 21, 1942, can not be applied retroactively to contracts completed before that date consistently with due process. The petitioner contends that the term "subcontract" can not extend to the work it performed prior to October 21, 1942, and that in the period between April 28 and October 21, 1942, it had no reason to believe that any part of its business could be classified as renegotiable.

The above are substantially all of the petitioner's contentions under this issue. Those which are not set forth are of like tenor. All have been carefully and fully considered and none has been overlooked. See *Stein Brothers Manufacturing Co.*, 7 T. C. 863, 878.

Several questions are raised by the above contentions which are discussed hereinafter, as follows: Whether petitioner's operations come within the reach of the term "subcontractor"; whether the facts support the petitioner's contentions that it could not determine what proportion or part of its operations in 1942 constituted renegotiable business; and whether the Renegotiation Act as applied to the petitioner's business in 1942 is constitutional.

In *Alexander Wool Combing Co.* v. *United States*, 66 Fed. Supp. 389; affd. *per curiam*, 160 Fed. (2d) 103; affd., 334 U. S. 742, the plaintiff contended, *inter alia*, that it was not a subcontractor under the act because it had no direct contracts with any Department of the Government, but combed wool only for different private companies, and because although it knew that some of the wool it combed was destined for use in Government contracts, it was ignorant as to the destination of other wool. The United States District Court held that it did not have jurisdiction to consider the question, since the proper procedure, of which the petitioner did not avail itself, was to resort to the Tax Court (*Macauley* v. *Waterman Steamship Corporation*, 327 U. S. 540). The Supreme Court sustained this ruling in the *Lichter* case, *supra*, p. 792. There is evidence in this proceeding which shows that the Alexander Wool Combing Co. was engaged in the same business as the petitioner, that its stock, like that of the petitioner, was owned by members of certain families who owned stock of NCo; and that some of its stockholders owned some of the petitioner's stock. This indicates to us that the questions under the present issue are closely similar to those which Alexander Wool Combing Co. attempted to raise in the United States District Court for Massachusetts, as the report in the above cited case shows. Since those questions

were not considered by either the District Court or the Supreme Court, they are now considered for the first time, and they appear to be questions of first impression, under the particular facts, in this Court.

We believe that the *rationale* of the Supreme Court's decision in the *Lichter* case disposes of the constitutional questions presented in this proceeding, but we shall refer briefly to them, later.

We reach the ultimate conclusion that the general contention of the petitioner that it was not a subcontractor within the coverage of the Renegotiation Act is not well founded; that petitioner was a subcontractor in 1942 and that, accordingly, the profits from its renegotiable business were subject to renegotiation; and that renegotiation of petitioner's profits from renegotiable business does not violate the due process or just compensation provisions of the Constitution.

(a) *Petitioner was within the scope of the term "subcontractor" during 1942.*

In considering the questions presented under this issue, a thorough search has been made of the available public records which throw light upon the reasons for and the intent of the Congress in including the terms "subcontractor" and "subcontract" in the original provisions of section 403 of Public Law No. 528, known as the Renegotiation Act, and for amending section 403, on October 21, 1942, to include a definition of "subcontract" under new subsection (5) of section 403 (a), because in this proceeding the question of whether or not the petitioner comes within the coverage of the act has appeared to be, in the first instance, a difficult and close question. The combing of wool is the first fabrication of a raw material, and the petitioner performed its services for a private concern which had no direct contracts with any Government Department. Since the petitioner is far down the line of production, the questions it has raised must receive the most careful consideration, and, therefore, the legislative background of the provisions in the Renegotiation Act relating to subcontractors has been reexamined at the expense of some duplication of the review which was given of the legislative background in *National Electric Welding Machines Co.*, 10 T. C. 49. Consideration of the intent of the Congress has been given with particular recognition of the nature of the petitioner's business as far as is disclosed by the record in this proceeding.

The provisions of section 403, *as originally enacted*, applied to all contracts with a Government Department, and to all subcontracts thereunder, whether or not any of them contained a renegotiation clause and even though made prior to April 28, 1942, provided that final payment under a contract or subcontract had not been made prior to that date, if, in the opinion of a Secretary of a Department of the Government, excessive profits *had been realized*, or were likely to be realized. Subsection (c) of section 403. Under this wording, the

coverage of the act was very broad. Where contracts or subcontracts were to be renegotiated, it was the intent of the Congress that they should be "renegotiated all the way down the line," and that the act would apply to contracts already made. (Cong. Rec., Apr. 7, 1942, pp. 3480, 3481, 3482.)

The original proposal for renegotiation of war contracts, the Case amendment to the Sixth Supplemental Defense Appropriation bill, did not apply to subcontractors. (Sec. 402A, H. R. 6868, 77th Cong., 2d sess.; Cong. Rec., March 28, 1942, p. 3228.) To the omission of subcontractors, the Secretary of the Navy expressed objection to the Senate Subcommittee on Appropriations, as follows: "This section would cover only prime contractors and thereby exclude subcontractors as now covered under the Vinson-Trammell Act." Hearings before the Subcommittee of the Committee on Appropriations, U. S. Senate, 77th Cong., 2d sess., on H. R. 6868, March 31, 1942, p. 69. Other objections to the wording of the Case amendment led to the drafting of a substitute amendment by representatives of the Departments of the Army and the Navy, and the Maritime Commission, at the request of the chairman of the Senate Subcommittee on Appropriations, who presented it to the Senate, and which was finally enacted as section 403 of Public Law No. 528. Cong. Rec., Apr. 7, 1942, p. 3480.

The statute was "Somewhat crude in its initial statutory simplicity," *Lichter* v. *United States, supra,* p. 766, and in September of 1942 the Departments charged with the administration of the Renegotiation Act brought to the attention of the Senate Committee on Finance the need for clarifying amendments based upon their experience since April 28, 1942, which would "clarify" but not change the purpose and policy of the act. Hearings before the Senate Committee on Finance on section 403 of Public Law No. 528, 77th Cong., 2d sess., Sept. 22, 23, 1942. Among the clarifying amendments which were indicated to be necessary was one to define the term "subcontracts." Two of the reasons which caused the recommendation were (1) the obligation of contractors under section 403 (b) to insert a renegotiation clause in subcontracts, and (2) a decision by the Board of Tax Appeals, on August 13, 1942, in *Aluminum Co. of America,* 47 B. T. A. 543; reversed, 142 Fed. (2d) 663; certiorari denied, 323 U. S. 728, that a supplier to a prime contractor under the Vinson-Trammell Act of fabricated or semifabricated materials which were either regular commercial products, catalogued for ordinary commercial use, or required additional fabrication, was not a "subcontractor" under the Vinson Act. The Vinson Act did not define the term "subcontractor." As a result of the above decision, doubt arose [6] as to the propriety of the Price Adjustment Board's interpretation of the term "subcontract" in

---

[6] Hearings before the Senate Committee on Finance on sec. 403 of Public Law No. 528, Sept. 22, 23, 1942, pp. 1, 2, 16, 19, 37, 38, 40, 50, 57, 60.

the Renegotiation Act, which interpreted the term as including any purchase order from a contractor "(iii) to make or furnish any article destined to become a component part of any article covered by this contract, or (iv) to make or furnish any articles acquired by the contractor primarily for the performance of this contract," and which defined "articles" to include any supplies, materials, machinery, equipment, or other personal property.

A subcommittee of the Finance Committee considered several proposed clarifying amendments of section 403, and, in the course of its hearings on September 29 and 30, 1942, the meaning of the term "subcontract" was given extensive consideration. The definition of subcontract which was finally agreed upon by the Departments of War and Navy, and the Maritime Commission, and which became subsection (5) of section 403 (a), as amended by section 801 of the Revenue Act of 1942, approved October 21, 1942, emerged out of discussions of narrow and broad interpretations of the term "subcontract," exemptions from the act, the necessity for reducing the *costs* of all materials flowing into war production, and considerations of various proposed definitions of "subcontract." All participants in these discussions were agreed upon one principle—that the term "subcontract" in section 403 as originally enacted was intended to have the broadest meaning—to include all subcontracts. The question was whether to adhere to that broad scope or to narrow the scope, as the War Department alone favored. The War Department proposed that "subcontract" be defined to mean "any purchase order or agreement to perform all or any part of the work, or to make or furnish any article required for the performance of another contract *except* * * * (i) raw materials, (ii) *standard commercial fabricated or semi-fabricated articles ordinarily sold for civilian use.* * * *" (Italics supplied.) It was stated in a memorandum to the subcommittee that the exception of "standard commercial fabricated or semi-fabricated articles" from the proposed definition reflected the view expressed by the Board of Tax Appeals in the *Aluminum Co.* case, *supra*, would exclude materialmen, and would leave prices of raw materials and standard articles ordinarily sold for civilian use "for regulation by the Office of Price Administration." Hearings on section 403 of Public Law No. 528, before the Senate Subcommittee on Finance, 77th Cong., 2d sess., September 29, 30, 1942, p. 54.

The Navy submitted a broader definition of "subcontract" which is set forth in the margin,[7] and expressed the view that "it was the

---

[7] [Hearings before Subcommittee, September 29, 30, 1942, p. 59.]

* * * * * *

(5) The term "subcontract" means (a) any purchase order or agreement (i) to perform all or any part of the work to be done or to supply all or any part of the articles to be furnished, under a contract with the Government, (ii) to supply any services required directly for the production of any article or equipment covered by such contract or any portion thereof, (iii) to make or furnish any supplies, materials, articles, or equipment

intention of Congress that excessive profits should be removed from all war contracts, irrespective of whether such contracts were of the character referred to in (1) and (2) above [raw materials and standard commercial articles]. For this reason, the Navy Department has proposed a definition of subcontract which includes virtually all contracts made with prime contractors of the Government." Page 58 of the Hearings before the Subcommittee on September 29, 30, 1942, *supra*. The Maritime Commission made the following objection: "If the Congress were now to exclude materialmen in defining 'subcontract' for the purposes of Public Law No. 528, section 403, it would seriously impede the administration of the recapture provisions of laws previously enacted." Hearings before the Subcommittee, Sept. 29, 30, 1942, p. 124.

Certain coal and lumber associations proposed that there should be exempted subcontracts for "any general commercial commodity subject to a ceiling price," and consideration was given to exempting certain raw materials, principally minerals.

Finally, the War and Navy Departments and the Maritime Commission agreed upon a definition of subcontract which was broad in its scope, which rejected the narrow definition of the War Department, and which went further than the proposal of the Navy Department in that it covered *any* purchase order to furnish or make *any* article required for the performance of *any other contract or subcontract*, thus going beyond the first tier of subcontracts. The definition which was agreed upon was in certain respects about the same as the definition which the War Department Price Adjustment Board had adopted in its interpretation of section 403 as originally enacted, in "Principles, Policy and Procedure To Be Followed in Renegotiation, [p. 7]" [8]

---

specifically destined to become a component part of any article or equipment covered by such contract, or (iv) to make or furnish any material, part, assembly, machinery, equipment, or other personal property acquired by the contractor exclusively for the performance of such contract, but shall not include any agreement to supply services or any such articles for the general operation or maintenance of the contractor's plan or business in those cases where the Government is not obligated to reimburse the contractor for the cost of such articles; (b) any purchase order from, or any agreement with, a subcontractor who is obligated to furnish completed articles called for under the contract of the contractor with the Government if such purchase order or agreement would be construed under paragraph (a) above as a subcontract if entered into with the contractor, and (c) any agreement of a subcontractor providing for the delivery to such subcontractor of completed articles called for under his subcontract.

[8] III. CONTRACTORS AND SUBCONTRACTORS WHO MAY BE REQUIRED TO RENEGOTIATE.

\* . \* \* \* \* \* \*

The term "subcontract" includes any purchase order from, or any agreement with, the contractor (i) to perform all or any part of the work to be done under this contract, or to make or furnish all or any part of any articles or structures covered by this contract; (ii) to supply any services required directly for the production of any articles or structures covered by this contract, or any component part thereof, not including services for the general operation of the contractor's plant or business, (iii) to make or furnish any articles destined to become a component part of any article covered by this contract, or (iv) to make or furnish any articles acquired by the contractor primarily for the performance of this contract, or this contract and any other contract with the United States. The term "articles" includes any supplies, materials, machinery, equipment or other personal property.

dated August 10, 1942, which is in evidence in this proceeding, and which was submitted to the Finance Committee. However, the definition agreed upon was broader than the administrative definition because it included subcontracts beyond the first tier of subcontractors.

The Hearings of the Finance Committee on September 22, 1942, and of the Subcommittee on September 29, 30, 1942, show that among the reasons which led to agreement upon the broad definition of subcontract which became part of section 403 (a), as subsection (5), were the following: The purpose of reaching out as far as possible to limit profits (Hearings, Sept. 29, 1942, p. 127). Reduction of costs of goods ultimately paid for by the Government as a basic means for reducing excessive profits; elimination of "piling up" costs, "padding" costs, "inflating" costs, and control of costs "from the beginning until it is produced." Pages 9, 10, 11, 12, 13, 14, 15, 33, 35, 37, 38, 40, 41, 42, 50, 51 of the Hearings on September 22, 1942; page 8309 Congressional Record, Oct. 10, 1942; and pages 7, 127 of the Hearings on September 29, 30, 1942. And that O. P. A. ceiling prices would not control excessive profits because O. P. A. prices contemplated a relatively normal volume of sales, and they did not achieve the purpose where increased volume resulted in lower costs. In this connection, it was pointed out that articles ordinarily sold for civilian use were being sold in great volume for war purposes, and that large volumes of sales even at O. P. A. ceiling prices brought in excessive profits. Pages 124, 125 of Hearings on September 29, 30, 1942. See also pages 68, 123–5, 127, 128, 135, 136, 147, 148, Hearings on September 29, 30, 1942, *supra*.

Because of the broad scope of the definition of "subcontract" which was agreed upon and which by itself even included raw materials, a new section was enacted in the amendments of October 21, 1942, to authorize exemptions from renegotiation, new subsection (i). Subsection (i) (1) (ii) exempted certain raw materials, mineral, and natural deposits and timber. But it was not until the reenactment of the Renegotiation Act, Title VII of the Revenue Act of 1943, on February 25, 1944, called the Second Renegotiation Act, that provision was made for exempting agricultural commodities in their raw or natural state. See subsection (i) (1) (C) of section 403, as amended by section 701 of the 1943 Revenue Act.[9] This amend-

---

[9] The provisions of this section shall not apply to * * *

* * * * *

(C) Any contract or subcontract for an agricultural commodity in its raw or natural state, or if the commodity is not customarily sold or has not an established market in its raw or natural state, in the first form or state, beyond the raw or natural state, in which it is customarily sold or in which it has an established market. The term "agricultural commodity" as used herein shall include but shall not be limited to—

* * * * * *

(iii) animals such as cattle, hogs, poultry, and sheep, fish and other marine life, and the produce of live animals, such as wool, eggs, milk, and cream ;

* * * * * *

ment was made retroactive to the date of the original Act, April 28, 1942; section 701 (d), 1943 Revenue Act.

At no time in its considerations of the various proposals to amend the act, including the amendments of February 25, 1944, did the Congress authorize exemption from renegotiation of "standard commercial fabricated or semifabricated articles ordinarily sold for commercial use," even though repeated requests were made. In the report of the House Naval Affairs Investigating Committee on Renegotiation of October 7, 1943, 78th Cong., 1st sess., H. Rept. No. 733, pp. 14–16, the matter was reported to the House, and it was recommended that "It seems preferable that the claims of particular industries, such as the textile industry, the shoe industry, and the lumber industry, be resolved by administrative action rather than by preferential legislation." In view of the fact that the same contentions as are made in this proceeding were made to the "Departments" and to Congressional committees, and to the House of Representatives, but were not considered to be sound, in the end, there is set forth in the margin a rather full quotation from the above report.[10]

In the Second Renegotiation Act, which applies to fiscal years ending after June 30, 1943, excepting for certain amendments made retroactive to April 28, 1942, a new subsection was enacted which defined "standard commercial article," and the War Price Adjustment Board was authorized to interpret by regulation that definition, but the new subsection was not made retroactive to April 28, 1942, but applied only to fiscal years ending after June 30, 1943. See sections 403 (a) (7), and 403 (i) (2) of the act as amended by section 701 (b) of the Revenue Act of 1943, and section 701 (d) of the Revenue Act of 1943.

---

[10] [H. Rept., No. 733, pp. 14–16; 78th Cong., 1st sess., Naval Affairs Investigating Committee on Renegotiation.]

Another focal point for the groups which have been seeking widespread exemptions from the law has been the problem of so-called standard commercial articles. A number of manufacturers have pointed out that the articles which they are producing for war are identical with the articles which they produced in peace; that, in fact, the articles in question were produced under peacetime competitive conditions for so long that the cost of production was known and a fair price could be fixed without the necessity of resorting to renegotiation. These same contractors also pointed out that in most cases the Office of Price Administration had fixed ceiling prices for these products, that they did not sell the goods at a price higher than the ceilings, and that hence additional price controls were not only burdensome, but unnecessary.

* * * After they had had time to review the matter, the Under Secretary of the Navy and the Chairman of the Maritime Commission felt that the arguments were specious, and that the proposal had no merit. * * *

The proponents of this exemption are principally contractors who manufactured textiles, welding equipment, bearings, nuts, and similar articles in peacetime, and who now manufacture the same products as their contribution to the wartime economy. * * * The situation in wartime, however, is entirely different. * * * *The tremendously expanded volume has resulted in considerable reduction in the unit cost, thus producing a greatly increased profit for the manufacturer.* * * * In wartime, however, there is no such thing as competition. All production is taken by the war effort; the Government needs everything that is being produced, and so does not receive the benefit of the cost reduction which would inure in peacetime. The figures presented to the committee by the War and Navy Departments, and incorporated in the record of our hearings.

Two other points should be made clear. The Congress was advised of the War Department Price Adjustment Board's interpretations of the original act, dated August 10, 1942, and of the administrative procedures which it had developed and followed, when the Congress enacted the amendments of October 21, 1942, and those amendments were enacted "in the light of the above mentioned directive and without restricting its effect." *Lichter* v. *United States, supra,* p. 783. The "Departments" promulgated a further Joint Statement of "Purposes, Principles, Policies and Interpretations," dated March 31, 1943, under the Renegotiation Act, as amended October 31, 1942, which set forth interpretations of the act and the administrative policies. In this Joint Statement the scope of the term "subcontract" was set forth at pages 10 and 11.

Some of the pertinent part of it is set forth in the margin.[11] In

---

demonstrate the increased and excessive profits which have been made by the manufacturers of *standard commercial products as the result of their greatly expanded volume.*

Nor is there validity to the suggestion that if such excessive profits do arise, they are adequately controlled by the price ceilings set by the Office of Price Administration. * * * *The setting of a price ceiling by the Office of Price Administration is no warranty that excessive profits are not being made by persons selling to the Government at the ceiling price.* * * *

* * * The studies which have been made * * * indicate very clearly that, even where an extra allowance is made to the producer for efficient production and for savings resulting from low cost production, sales at the ceiling price by such a producer generally result in a high and excessive profit. * * *

It has been said that where a manufacturer produces bearings or some kindred article and sells them to other manufacturers who in turn may or may not sell their end product to the Government, he has no way of knowing that the end use of the bearing which he produced will be in connection with the war. He does not say that, however, when he seeks priorities for the production of his products. * * * We think that generally the priorities which a manufacturer obtains and other indices available to him, can assist him materially in segregating his war production from his civilian production.

The Renegotiation Act, as it is now written, specifically gives the secretaries power to exempt from renegotiation contracts where, by reason of certain knowledge of costs of production at the time the contract is entered into, it is possible to contract for them at a price which will not be susceptible of excessive profits. It seems preferable that the claims of particular industries, such as the textile industry, the shoe industry, and the lumber industry, be resolved by administrative action rather than by preferential legislation. [Italics added.]

[11] [Joint Statement, Mar. 31, 1943, pp. 10, 11.]

* * * This definition of "subcontract" is much broader than under the Vinson-Trammell Act, in that profits on the production and sale of articles required for the performance of another contract or subcontract are subject to renegotiation, as well as profits on the production or sale of all materials incorporated into the end product, down to and including raw materials, except in the case of certain specified raw materials exempted under subsection (i) (1) (ii) of the statute. This definition is interpreted to include contracts with contractors and subcontractors (a) for the sale or processing of an end product or an article incorporated therein, * * * and (d) for the performance of personal services required for the performance of the contracts and subcontracts included in (a), (b) and (c).

* * * * * * *

The term "article" has also been interpreted to include commercial products as well as equipment fabricated for particular uses or purposes. The fact that commercial products are sold for industrial uses, either directly or through jobbers or other commercial channels, does not exclude such articles from this definition. The same tests are applied to both ordinary commercial products and equipment fabricated for special uses and purposes.

The fact that all or part of such articles are sold under price ceilings fixed by the Office of Price Administration does not exclude such articles from this definition, or exempt profits made on the sale thereof from renegotiation.

the Joint Statement the principle for making allocation between renegotiable and nonrenegotiable sales was set forth. It was, briefly, that allocation of sales would be made on the basis of use, and sales of articles having a war end use, i. e., incorporated into the end product made under a Government contract or subcontract, would be subject to renegotiation. The extent to which the production of the *purchasers* to whom sales were made was renegotiable would be the test to be applied in making allocation between renegotiable and nonrenegotiable sales.[12]

In 1943 there were further amendments of the original act, and in the early part of 1944 the act was reenacted as Title VII of the 1943 Revenue Act. See Public Laws 108 and 149, of July 1, 1943, and July 14, 1943, 78th Cong., 1st sess.; and the 1943 Revenue Act. The Joint Statement of March 31, 1943, was made known to the appropriate Congressional committees. Hearings before the House Committee on Naval Affairs, 78th Cong., 1st sess., vol. 2, pp. 469, *et seq.*, 1025–1039, especially 1030 (1943). And it was "substantially incorporated into the statute" enacted on February 25, 1944. *Lichter* v. *United States*, *supra*, p. 783. The Joint Statement thereby "became an express Congressional definition of the factors appropriate for consideration" in construing the scope of the definition of "subcontract," subsection (5) of section 403 (a), and in applying the definition. *Lichter* v. *United States*, *supra*, p. 783.

When subsequent amendments of the act were considered in 1943 and 1944, some proposals were made to reduce the area of renegotiation, but with one or two exceptions not pertinent here, they were rejected and the definition of "subcontract," enacted in October, 1942, remained the same in the Second Renegotiation Act. The appropriate Congressional committees were advised of objections of the textile industries and of the Boston Wool Trade Association to renegotiation. The latter association submitted a brief in which the same contentions which are made in this proceeding were made.[13] Review of the considerations of the Congress after October 21, 1942, show that it was understood that the term "subcontract" extended to orders

---

[12] [Joint Statement, Mar. 31, 1943, p. 11.]
 * * * Thus if 60% of the sales of the purchasers to whom such machinery and equipment are sold is renegotiable, such sales of machinery and equipment are considered renegotiable to the same extent. In those cases where it is unduly burdensome or impractical to trace the end use of individual items of machinery or equipment, the Departments frequently make this determination on the basis of industry-wide estimates or by some other method mutually agreed upon.

[13] See the following: House Committee on Ways & Means, 78th Cong., 1st sess., Sept. 9–23, 1943, Hearing on Bills to Amend the Renegotiation Act, pp. 801–5; House Subcommittee on Appropriations, 78th Cong., 1st sess., Hearings June 1, 1943, pp. 490, 491, 509, 510; Senate Subcommittee on Appropriations, 78th Cong., 1st sess., Hearings June 22, 1943, pp. 136, 137; House Ways & Means Committee, 78th Cong., 1st sess., Rept. No. 871, pp. 78, 79; Senate Finance Committee, Rept. No. 627, pp. 98–102; Data on Renegotiation of Contracts, Dec. 9, 1943, U. S. Govt. Printing Office, p. 6; Conference Rept. No. 1079, 78th Cong., 1st sess., Feb. 4, 1944, p. 35.

for materials which were to be a component part of, or incorporated into an article which was made under Government contracts.

From all of the voluminous records of the legislative considerations of the meaning of the term "subcontract," and the scope of the definition which was adopted as a *clarifying* amendment, it must be concluded that the administrative practices with respect thereto were approved by the Congress as coming well within the scope of the Congressional intent and policy. If they had not been so approved, further amendments by the Congress would have been enacted to rectify administrative error.

Review of the legislative hearings which preceded and attended the adoption of the definition of subcontract convinces us that in this proceeding it is correct to adopt the views previously expressed by this Court that "The statutory definition of a subcontract is extremely broad," *Grob Brothers*, 9 T. C. 495, 501; and that "the mischief at which the legislative remedy was aimed required that the term 'subcontract' be used so as to sweep into the scope of the legislation all activities directly related to production for the war-making Departments"; and that this could not be done without including articles "bought primarily for the purpose of producing products with a *war-end use*." (Italics added.) *National Electric Welding Machines Co., supra*, p. 60.

Under section 403 (i) (1) (C) of the Second Renegotiation Act, defining exempt agricultural commodities, the War Price Adjustment Board, as authorized under subsection (i) (2), in the Joint Renegotiation Manual for fiscal years ending prior to June 30, 1943, interpreted subsection (i) (1). (C), as it applied to wool, to mean that the last form or state to which the exemption applied was grease wool, as clipped from live animals. Joint Renegotiation Manual, secs. 343.3 and 844.[14] Under this interpretation, the processes which the petitioner performed were not exempt.

[14] Section 343.3. CONTRACTS AND SUBCONTRACTS FOR AGRICULTURAL COMMODITIES.
\* \* \* \* \* \* \*
(2) INTERPRETATION AND APPLICATION OF EXEMPTION.
\* \* \* \* \* \* \*
(b) INTERPRETATION. \* \* \* In order to qualify for exemption the product contracted for must be an agricultural commodity in its raw or natural state, or if such a commodity is not customarily sold or does not have an established market in its raw or natural state in the first form or state beyond the raw or natural state in which it is customarily sold or in which it has an established market.
(c) APPLICATION.—A commodity will be deemed to be an agricultural commodity in its raw or natural state only so long as it has not undergone some process of treatment or fabrication. \* \* \* the exemption will not apply to any derivative products which are derived from such commodity in the state in which it is first sold, whether as a result of division, separation or further treatment or processing. For the purposes of determining whether an agricultural commodity is customarily sold or has an established market, regard will be given to the entire field in which such commodity is produced or marketed rather than to sectional or local practices; \* \* \* The War Contracts Price Adjustment Board has, pursuant to the authority conferred upon it by subsection (i) (2) of the 1943 Act, determined the form or state at which the exemption terminates in the case of each of the agricultural commodities set forth in paragraph 644 [sic] of the Renegotiation Regulations and will continue to determine and publish from time to time additions to this list.

Resort has been made to the legislative background because the question is one of first impression and, as stated before, is a close one. Our conclusion is that the petitioner's operations under orders to sort, scour, and comb wool come within the scope of the term "subcontract." Wool tops and noils are the basic material in the yarns which are woven into textiles, and are materials which become incorporated in and are the component part of textiles. Although a processor, the petitioner's work was so essential to that which the seller of tops and noils sold, the seller being a materialman, that the petitioner was also a materialman in the broadest sense of that term. The petitioner's processes yielded a semifabricated article. There is no doubt that the Congress intended to and did define the term "subcontract" so broadly that it covers the petitioner. Proposals to exempt materialmen and suppliers of semifabricated articles which customarily are used in the production of civilian goods were rejected by the Congress when it enacted on October 21, 1942, the amendment which clarified the meaning of "subcontract" in the Renegotiation Act. Finally, we are unable to conclude from anything in the record before us that the administrative interpretation of exempt agricultural products was unreasonable or wrong as applied to wool. It is concluded, therefore, that the petitioner's processing was not within the exemptions allowed by subsection (i) of section 403, as amended. The question of whether the sorting operation was exempt will be considered hereinafter.

There is the further question of whether the petitioner's operations on orders for which payment was completed prior to October 21, 1942, did not come within the coverage of the act because the term "subcontract" was not defined in the act until the amendment was enacted on the above date. Having reviewed and having set forth at length above the legislative intent with respect to the meaning of the term "subcontract" in the original act, it is concluded in this proceeding that the amendment which inserted a definition of "subcontract" only clarified and declared beyond doubt the meaning of that term in the original act, and did not represent a change in the existing statute. The term "subcontract" was used from the beginning with a breadth sufficient to cover the work and processes of the petitioner upon orders in existence but not finally paid for on April 28, 1942, and upon orders received thereafter and paid for before October 21, 1942. *National Electric Welding Machines Co.*, *supra*, pp. 60, 61, 62.

We are asked to construe the meaning of the word "required" in the definition of "subcontract"—"required for the performance of any other contract or subcontract." The petitioner contends that under the facts in this proceeding the fact that material which it processed was used by others in filling orders under Government subcontracts or contracts is not determinative of the general question whether the

petitioner is subject to renegotiation. In other words, the petitioner objects to the test, which the respondent has applied, of the "end-use" of the materials which it processed during 1942. The interpretation of the term "subcontract" which was made by the War Price Adjustment Board, which has been quoted above (footnote 10), was that the definition included "contracts with contractors and subcontractors (a) for the sale or processing of an end product or an article incorporated therein." It has been pointed out above that Congressional approval was given to the Joint Statement of March 31, 1943. The expression "end-use" appears to be a convenient and voluntary expression which may have been generally used, but the administrative interpretation has consistently referred to "an end product or an article incorporated in an end product by chemical, physical or mechanical methods" (section 333.3, Joint Renegotiation Manual for fiscal years ending on or prior to June 30, 1943.) The term "required" was intended to mean *directly* related to the production of goods under any subcontract or contract for the production of goods under Government orders. This is clear from the reports of various Congressional committees which considered the various amendments which were made to the Renegotiation Act. If the dictionary definition is helpful, the verb "require" is defined to mean "to render or find indispensable."

The legislative background which has been reviewed shows that the principle of "over-all" renegotiation was intended by the Congress; that the definition of "subcontract" was not limited to the first tier of subcontractors; and that the definition of "subcontract" refers to any purchase order or agreement to perform all or *any* part of the work, or to make or furnish *any* article, required for the performance of *another* contract or subcontract. Section 403 (c) authorized the Secretary of each Department and directed him to require a contractor or subcontractor to renegotiate the contract price whenever in his opinion "excessive profits have been realized, or are likely to be realized, from *any* contract with such Department or from *any* subcontract thereunder." It is concluded, therefore, that the determination of the respondent in this proceeding was not in error because he held that the petitioner, in 1942, performed work on orders for materials which, in fact, were incorporated in, by mechanical methods, an end product which was produced under other subcontracts and contracts to fill Government orders. In other words, the word "required" is properly construed to cover purchase orders or agreements to perform work or furnish an article the end use of which is required for the performance of another contract or subcontract.

The question raised by the petitioner is, rather, whether the procedure followed by the War Price Adjustment Board in making allocation of a subcontractor's sales and profits between his nonrenego-

tiable and his renegotiable business is reasonable and proper under the act. That is the real point at issue under the petitioner's objection to the test of "end-use" in determining whether any of the profits from its business are renegotiable. This point is not discussed in the petitioner's brief, but we perceive it to be the crux of the matter, and therefore consider this question.

At various times in the hearings held by appropriate Congressional committees, representatives of the War Price Adjustment Board appeared and discussed the administrative procedures which had been developed under the Renegotiation Act; and the method of making allocation between nonrenegotiable and renegotiable business was presented to the committees. That procedure is also described in the Joint Statement of March 31, 1943, pages 10 and 11 (see footnote 12), which was approved by the Congress. The Joint Renegotiation Manual, applicable to years ended before June 30, 1943, provided the same procedure for determining the amount of renegotiable business as distinguished from nonrenegotiable business. The question is whether these procedures were reasonable, and were within the intent and policy of the Congress under the Renegotiation Act.

The following interpretations and procedures appear in chapter III, Section 3, of the manual:

333.4. GENERAL EFFECT OF INTERPRETATION.

(1) In general it is intended to include as subject to statutory renegotiation the sale of all machinery, equipment, materials and other articles which contribute directly to the actual production of an end item or an article incorporated therein, in connection with the physical handling of the item from the time of entry of the component materials to departure of the item from the plant in question.

\*   \*   \*   \*   \*   \*   \*

(3) It is not intended, however, to exclude from renegotiation any articles sold directly to a Department, or to a contractor when the items are to be ultimately resold to a Department either as end products or as component parts included therein.

333.5. ALLOCATION OF SALES. Sales of such machinery and equipment are allocated on the basis of the use thereof (i. e., for renegotiable or non-renegotiable production) ; and when the extent of the use can not be readily established, such sales are considered renegotiable in substantially the same proportion as the production of the purchasers of the machinery and equipment is subject to renegotiation.

It was part of the duty of those administering the Renegotiation Act to apply the provisions of the act to the lower tier subcontractors, and the problems involved are reflected in the statement in paragraph 320 of section 2, chapter III, of the Manual, as follows:

\*   \*   \* but in practice, the difficulty of tracing and identifying all sales with exactness, especially under lower-tier subcontracts, often necessitates the use of general methods of segregating renegotiable and non-renegotiable business and expenses.

In the first instance, the subcontractor himself was called upon, in all cases, to make the segregation of sales and the allocation of costs between the two types of business. Under section 403 (c) (5) of the Renegotiation Act contractors and subcontractors could file statements of costs with the Departments concerned. Also, all companies engaged in war production had to file with the War Production Board reports for their particular raw materials, and most of these reports required a segregation of shipments between products ultimately used for the war effort and products consumed for civilian purposes. Various methods of making segregation are set forth in the Manual (par. 322.4); but,. in the instances where a contractor might not be able "specifically to identify all or part of his sales as subject or not subject to renegotiation," other methods were suggested which were "calculated to provide a reasonable and equitable division between renegotiable business and nonrenegotiable business." (Par. 322.3.)

It is to be noted also that the Renegotiation Act covered subcontracts which did not have a renegotiation clause in the contract.

Altogether, we can not say that the War Price Adjustment Board, in the Joint Renegotiation Manual, did not provide *reasonable procedures for the determination of allocations between nonrenegotiable and renegotiable business.* Nor can we say that these administrative procedures were not within the scope of the act and of the policy and intent of the Congress; or that they were unreasonably applied to the petitioner, from the record which is before us.

It is concluded, therefore, that the respondent did not err in the allocation which he made of the petitioner's business in 1942 between its nonrenegotiable business and its renegotiable business on the basis of facts which showed the "end-use" of the materials which the petitioner processed during 1942.

The foregoing relates to the questions of law presented which are concerned with the coverage of the act as applied to the business of the petitioner. Under this particular part of the issue, all of petitioner's contentions are overruled. The next question to be considered is a fact question, whether the evidence in this proceeding supports the petitioner's contention that no part of its operations in 1942 constituted renegotiable business.

(b) *Under the facts, part of petitioner's 1942 business is renegotiable business.*

The petitioner has stipulated that for the purposes of this proceeding all of its business for which final payment was received after April 28, 1942, came from NCo, that its receipts from sales of wool grease came from three customers of NCo who advised it that $19,240.37 of such sales was ultimately used in the performance of Government contracts; and that customers of NCo who paid petitioner for the process

of cutting (only) wool tops, advised petitioner that $1,035.13 of such cuttings were ultimately used in the performance of Government contracts. The petitioner has stipulated that customers of NCo who purchased wool tops and noils which the petitioner combed in 1942 advised NCo that of the work petitioner performed in sorting, scouring, and combing wool, charges aggregating $274,746.85 were for the work of petitioner on material which was ultimately used in the performance by them of Government contracts. NCo obtained the information upon which the above stipulations are based from its customers. NCo appears to have been a subcontractor, itself, selling material in 1942 to others who incorporated the material in goods which were made to fill Government contracts. Two officers of NCo gave testimony in this proceeding. Presumably they knew who their customers were in 1942, who paid for wool tops and noils after April 28, and what the information was which NCo received upon inquiry about the civilian and Government orders for which materials purchased from NCo were used. Nevertheless, the petitioner failed to offer any evidence to support, explain, or qualify the stipulations it made, as set forth above and in the findings of fact. For example, it seems reasonable to believe, in view of petitioner's stipulations, that the petitioner could have produced more detailed evidence about the customers who purchased the wool products which the petitioner processed in 1942, the extent of the nonrenegotiable and of the renegotiable business of those customers, whether they had furnished reports to the War Price Adjustment Board showing the amount and source of the wool tops and noils which they used in both nonrenegotiable and renegotiable business in 1942 or early in 1943, and whether the goods into which they incorporated the materials which the petitioner processed in 1942 were made to fill Government orders then in existence. But the petitioner failed to introduce any evidence about these matters.

The record in this proceeding does show that in 1942 weaving mills were unable to keep on hand an inventory of wool tops or wool noils because the demand for wool textiles was so great; that it required about two weeks for the petitioner to comb wool under orders; that the Government contracts in 1942 called for wool tops of grade 64 and 62, only, which were the grades petitioner combed in 1942; and that the petitioner "surmised" in 1942 that wool it combed was to be used in making textiles under Government orders.

The petitioner, in our opinion, has failed to make a case for itself under the fact question, and we can not sustain its contention that none of its profits in 1942 are renegotiable upon the ground of mere allegation that it could not ascertain whether the wool it processed in 1942 was incorporated in goods made under Government contracts. The stipulation is specifically that the petitioner received payment in

1942, after April 28, of $295,022.35, and profit therefrom of $95,643.25, for work on materials which were *ultimately used* by others in filling Government contracts. Petitioner has taken the position that it is willing to rest upon the stipulations rather than go forward and present direct evidence about the orders under which it processed materials, if the question of whether it was within the coverage of the act in 1942 is determined by this Court in the affirmative.

The question of coverage in this proceeding is a mixed question of law and of fact. It has been held above that the definition of "subcontract" is broad; that "required" includes materials directly used as a component part of articles made under Government contracts or subcontracts; and that the respondent had the duty and power to make allocations, under the act, between nonrenegotiable and renegotiable business. Under the fact question, it is held that the petitioner has failed to show that it did not have renegotiable business or sales in 1942 for which it received payments after April 28 in the gross amount of $295,022.35. The stipulations support the conclusion that petitioner had renegotiable business in that gross amount. The petitioner has agreed that the renegotiable profit amounted to $95,643.25. The respondent presumably made allocation between the nonrenegotiable and the renegotiable business of the petitioner upon the basis of information which was provided by NCo. If the respondent's determination was wrong, arbitrary, or unreasonable, the petitioner should have, and we believe could have, demonstrated the above matters in this *de novo* proceeding through the officers of NCo, or through customers of NCo. These things, petitioner did not do. It is concluded, under the stipulations and evidence in this proceeding, that the respondent did not err in determining that petitioner's renegotiable business in 1942 was in the gross amount of $295,022.35, and that the profit realized was $95,643.25.

We have given consideration to other contentions, namely, that the petitioner may not have ascertained until after it completed work on orders in 1942, and received final payment, what proportion of the semifabricated material which was produced by its processing was required for the performance of other subcontracts or contracts with the Government; that renegotiation was not made of its 1942 renegotiable business until 1944; that there were no clauses in any orders or agreements under which it did work in 1942, providing for renegotiation; that it may have been difficult to identify and trace specific lots of wool tops and noils which petitioner processed in 1942 to their incorporation in other materials which were made under Government orders; and that customers could allocate the semifabricated or fabricated wool, at will, to materials made for civilian consumption requiring the same type and grade of wool as materials to be made under Government orders. These points are answered, briefly, as follows:

Section 403 (c), as originally enacted, and as amended, provided that the Act "shall be applicable to all contracts and subcontracts hereafter made and  *  *  *  heretofore made," whether or not they contained a renegotiation clause.  The legislative history shows that in the Congressional debates it was recognized that renegotiation would be made of existing contracts, and of completed contracts, and the provisions of section 403 (c) were enacted over express objections thereto because the statute was intended to be a *repricing* statute and its purpose was to reduce to reasonable amounts all ultimate costs to the Government for materials purchased in pursuance of the war effort. The same general questions were presented in *National Electric Welding Machines Co.*, *supra*, which involved the renegotiation of profits realized in 1942 under contracts with Defense Plant Corporation created by R. F. C., which was not a "Department" covered by the act originally.  It was not until July 1, 1943, that, by amendment, the Renegotiation Act included among renegotiable contracts, those made with the Defense Plant Corporation.  We held that the July 1, 1943, amendment had retroactive force to the date of the original act, and that, so applied, the retroactive provisions were not unconstitutional. We held, also, that the fact that the contracts were paid in full before July 1, 1943, presented a distinction in fact, but no difference in principle from our holdings in *Stein Brothers Manufacturing Co.*, *supra;* and that the petitioner was a "subcontractor," since the machines it sold were used primarily to produce products with a "war-end use." The *rationale* of the *National Electric Welding Machines Co.* case controls certain questions raised here.  See, also, *Lichter* v. *United States*, *supra*, pp. 788, 789.

With respect to the alleged difficulties of tracing the semifabricated product into the materials of which they became a component part, it was the intent and the policy of the Congress that the detailed administration of the act should be delegated to the "Departments"; that the act should include the lower tier subcontractors who provided materials for other subcontractors; and that renegotiation involved making allocations between nonrenegotiable and renegotiable business because standard articles, customarily and ordinarily made for civilian use were being purchased in very large quantities for Government use.  Objections to the broad definition of "subcontract" included those about which petitioner complains, namely, the difficulty of tracing standard commercial semifabricated articles ordinarily made for civilian use into Government orders, where the same articles were also purchased to fill civilian orders.  Such articles were not exempted under the act.  The Renegotiation Manual provides methods for making segregation *where specific segregation is not feasible.*  The administrative methods set forth in the Manual have not been shown

to be unreasonable or arbitrary in this proceeding, particularly in view of the stipulations of the parties. As has been stated in *Lichter* v. *United States, supra,* p. 785:

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the Congressional policy to infinitely variable conditions constitute the essence of the program.

It may be said in this proceeding, with equal validity, as was said in the *Lichter* case by the Supreme Court, that the purpose of the act, its factual background, and the legislative policy as disclosed by the records of the Congress, establish a sufficient meaning for the clause "required for the performance of another contract or subcontract" as it is used in the definition of "subcontract." There was a sufficient expression of the legislative standard to be applied. It is concluded that the respondent's segregation of the renegotiable business of the petitioner from its nonrenegotiable business was valid and was not unconstitutional.

The petitioner has contended that it is not subject to renegotiation because its charges for all services performed in 1942 did not exceed the rates allowed by O. P. A. The legislative background of the act shows beyond doubt that the Congress intended that the Renegotiation Act should cover articles sold at prices within O. P. A. ceiling prices, because of the policy of the Congress to reduce costs all down the line of production.[15] The contention is rejected. *National Electric Welding Machines Co., supra,* p. 62.

*Issue 3.*—The question under this issue is whether the provisions of section 403 (i) (1) (C), exempt petitioner's profits from charges for sorting wool from renegotiation.[16]

Under issue 2 reference has been made to the limitations of the exemption provisions. See footnote 14.

Petitioner does not deny that wool was "actually sold" or had an "established market in its raw or natural state." However, petitioner argues that the sorting of grease wool, for which petitioner made a separate charge, involved only the handling of raw wool, without any processing, and that the sorting charges are exempt as a "contract or subcontract for an agricultural commodity in its raw or natural state." We do not agree with this contention.

Wool was purchased by the top maker on an established market. It was then brought to petitioner to be combed into tops and noils.

---

[15] House Rept. No. 733, 78th Cong., 1st sess., p. 15; Naval Affairs Committee, Investigations of Renegotiation. "The setting of a ceiling price by the Office of Price Administration is no warranty that excessive profits are not being made by persons selling to the Government at the ceiling price."

[16] The stipulations and the record fail to show an allocation of charges for sorting wool between non-renegotiable and renegotiable business; nor the profit from sorting charges.

There is no evidence that any wool was brought to petitioner for the purpose of sorting, only. The production of tops and noils required that the grease wool be sorted, first, in preparation for succeeding steps in the entire process. After it was sorted it was scoured, carded, backwashed, gilled, and combed. Sorting was only one of the several steps in the entire process, and the proper performance of each step was essential to the performance of the succeeding step and of the total operation. Although petitioner made a separate charge for sorting wool, which appears to have been customary, this is immaterial in view of the integrated nature of its processing. It is held that petitioner's profits from charges for sorting are properly subject to renegotiation.[17]

The War Price Adjustment Board was authorized under subsection (i) (2) to interpret subsection (i) (1) (C), and to determine at what point the exemption of various raw materials ended. In the case of wool, the Board determined that the last state of raw wool to which the exemption applied was grease wool. During hearings of the Senate Committee on Finance on proposed amendments of section 403, which were enacted in the 1943 Revenue Act (footnote 17), consideration was given to a request of the Boston Wool Trade Association that the exempt state of wool should include the first processing of raw wool through combing, rather than end at grease wool. Further exemption was requested, but it was admitted that "Wool is sold in its raw or natural state." The War Price Adjustment Board informed the Finance Committee that it understood that the Congressional intent was to grant exemption of agricultural products only up to the point where the product "left the hands of the original producer and where it got away from the farm, or away from the ranch," but that "once it got into industry there is no reason for extending the exemption beyond that point." The chairman of the Finance Committee observed that the first processing which came after the sale of wool was "not necessary for the sale of wool."

The only inference which can be made is that, when new (C) was being considered by the Congress for inclusion in subsection (i) (1), consideration was given to the proposal to make the exempt status of wool broader than the administrative officials considered proper, but the proposals were rejected.

The refusal of the respondent to exempt petitioner's profits from sorting charges was correct under his administrative construction. Petitioner has failed to make a case under this issue; it has not introduced evidence to show that the construction of the exemption clause as applied to wool was unfair, inequitable, unreasonable, or im-

---

[17] See Confidential Hearing Before the Committee on Finance, U. S. Senate, 78th Cong., 1st sess., Dec. 10, 1943, pp. 18–19.

proper. Therefore, in the light of the record of the considerations of the Finance Committee we are unable to hold that the respondent erred in renegotiating profits from charges for sorting wool.

*Issue 4.*—There remain for consideration questions about the constitutionality of the Renegotiation Act as applied to the petitioner's profits for 1942. In *Lichter* v. *United States, supra,* pp. 789, and 792, the Supreme Court held that the October 21, 1942, amendments were retroactive to April 28, 1942, and that the contracts with private parties made by the Alexander Wool Combing Co. between April 28 and October 21, 1942, came within the scope of the act. We make the same holding in this proceeding.

In concluding above that the petitioner is a "subcontractor," we have reexamined many reports of Congressional committees to ascertain the Congressional intent. Having found clear indication of the legislative intent, the *rationale* of the *Lichter* case is applicable, in our opinion, to the questions of constitutionality presented here, and disposes of them specifically in some instances, and impliedly in others.

The renegotiation of the petitioner's profits from its renegotiable business in 1942 was not a taking of private property for public use; recapture of part of its profits is not in the nature of a penalty; and the term "excessive profits" was a sufficient expression of legislative policy. *Lichter* v. *United States, supra,* pp. 783, 788; *National Electric Welding Machines Co., supra,* p. 59.

In *Lichter* v. *United States, supra,* pp. 758–772, the Supreme Court held that "the Renegotiation Act was a law 'necessary and proper for carrying into execution' the war powers of Congress and especially its power to support armies." The Supreme Court pointed out that controversies under the act were not so much concerned with the general effect of the "plan" of the statute as with "alleged abuse of discretion in its administration," p. 772. In this proceeding, petitioner's contentions about the constitutionality of the act are directed at the administrative interpretations and application of the act as applied to its business. Consideration has been given to questions of the validity of the delegation of authority to the "Departments" in construing and applying subsections (a) (5) and (i) (1) (C) of section 403, and to the statutory language thereof with respect to the adequacy of the expression of a legislative standard. Under issue 2 *supra,* we have discussed the legislative intent. Under the *rationale* of the *Lichter* case, we conclude that the term "subscontract" is a sufficient expression of legislative policy and standards to render it constitutional as applied to the petitioner, and that the delegation of administrative authority involved in construing and applying the provisions of the subsections in question was not an unconstitutional delegation of power. We are unable to hold that the administrative interpretations of "subcontract," and of the last state of an exempt

agricultural product—wool—were unreasonable or outside of the Congressional intent and policy. It is held, therefore, that the act as applied to the petitioner is constitutional.[18] *Lichter* v. *United States, supra,* pp. 757, 758, 765, 770, 771, 778, 783, 787, 788. See, also, *United States* v. *Pownall,* 65 Fed. Supp. 147; and *Alexander Wool Combing Co.* v. *United States,* 66 Fed. Supp. 389; both affirmed by *Lichter* v. *United States, supra; Spaulding* v. *Douglas Aircraft Co.,* 154 Fed. (2d) 419; *Welch* v. *Henry,* 305 U. S. 134, 147; and *National Electric Welding Machines Co., supra.*

*Issue 5.*—The final question is whether any part of the petitioner's profits in 1942 from its renegotiable business was excessive within the meaning of that term in the act. Each of the elements to be considered in deciding whether profits are excessive which are set forth in section 403 (a) (4) (A) of the act, as amended, has been considered. It is concluded that part of petitioner's profits for 1942 were excessive.

Petitioner, in processing wool owned by the top maker had no inventory risk, and its profit margin eliminated virtually all risk from its own pricing policy. Petitioner's total receipts during 1942 amounted to $698,872.96 and its profits before taxes were $226,567.31, which was 32.4 per cent of both its nonrenegotiable and renegotiable business, so that its margin of profit above costs was about 48 per cent. Even after recapture of profits in the amount originally determined by the Under Secretary of War, petitioner's profits on its renegotiable business would amount to about 13 per cent, and its profit margin above costs would be over 19 per cent. As of the beginning of 1942, petitioner's capital stock and surplus totaled $62,718.17. Its profits before taxes on renegotiable business *alone* amounted to 152 per cent of this total investment. Assuming a refund as originally determined by the Under Secretary of War, petitioner would still retain, as profits before taxes on renegotiable sales, an amount equal to over 60 per cent of its combined capital stock and surplus accounts.

Petitioner commenced its operations on May 1, 1940, after the war in Europe had begun and after the impact of war orders had been reflected in the economy of the United States. Consequently, petitioner has no period of normal prewar earnings to serve as a basis of comparison with its profits during 1942. Moreover, petitioner has not introduced any persuasive evidence with respect to the normal prewar earnings of commission combers similar to petitioner. However, the record reveals statistics indicative of the marked effect of the war on the activity of the wool-combing industry generally. It appears that combing activity by commission combers and vertical

---

[18] In our consideration of the questions presented under issues 2, 3, and 4, judicial notice has been taken of official reports of Congressional Committees, of the Congressional Record, of the Joint Renegotiation Manuals of the War Price Adjustment Board, and of the Joint Statement of March 13, 1943, and in every instance citation has been given of the matter which has been noticed.

mills, both using the same combing method as petitioner, increased in 1942 to approximately 184 per cent of the average activity during the years 1936 to 1939, inclusive. During 1942, petitioner's prices for its services compared favorably with those of its competitors; its capital was obtained from private sources; and it utilized its productive capacity during extremely long hours. On the other hand, approximately $21,000 worth of the machinery used by petitioner during 1942 was purchased under certificates of necessity, which permitted an accelerated rate of depreciation. Some of this machinery is still in use. Petitioner's manufacturing technique is not highly complex, and the nature of its work was the same, whether it processed wool for use in making goods under civilian or under Government orders. No expenditures were required by petitioner for postwar conversion of its plant because its production during the war period did not involve any conversion of its machinery and processes to any different plan of operations than it normally followed. Also, petitioner made no inventive, developmental, or other special contributions to the war efforts.

The problem is to determine the extent to which the petitioner's profits in 1942 from its renegotiable business was excessive, i. e., the amount of the excessive profits. The respondent determined in the first instance that profits from renegotiable business were excessive in the amount of $57,500. Then, in this proceeding he asserted that profits were excessive in an additional amount of $15,000. "As to the proposed increase in the amount of excessive profits, the burden of proof rests upon the respondent, while the burden of showing that the original determination is erroneous rests upon the petitioner." *Lehman Machine Co.* v. *R. F. C. Price Adjustment Board,* 10 T. C. 350, 355; *Nathan Cohen* v. *Secretary of War, supra.*

Upon consideration of all of the evidence and of all the factors set forth in section 403 (a) (4) (A) of the Renegotiation Act, we are unable to conclude that the original determination of the respondent was wrong. His determination that profits were excessive in the amount of $57,500 results in petitioner's realization and retention of profits in the amount of $38,143.25 from its renegotiable business. The petitioner has not submitted evidence which establishes that the latter amount is not the fair and reasonable amount of profit upon its renegotiable business. On the other hand, the respondent has failed to establish, under his affirmative burden of proof under the issue which he has raised in this proceeding, that profit in the amount of $38,143.25 is "so palpably unreasonable or excessive as to justify" a further decrease in the amount of $15,000, or any other amount. *Nathan Cohen, supra.* The respondent introduced very little evidence in carrying out his burden of proof, and that which he introduced fails to convince us that the amount of the excessive profits from renego-

tiable business should be increased above that which he originally determined.

We have found as a fact, therefore, that the petitioner's profits from its renegotiable business in 1942 were excessive in the amount of $57,500.

Reviewed by the Court.

*An order will issue in accordance herewith.*